NO. 4-08-0894          Filed 12/23/09

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE ILLINOIS DEPARTMENT OF HUMAN          )     Appeal from
SERVICES,                                 )     Circuit Court of
      Plaintiff-Appellant and             )     Sangamon County
      Cross-Appellee,                     )     No. 07MR467
      v.                                  )
CANDY PORTER,                             )
      Defendant-Appellee and              )
      Cross-Appellant,                    )
      and                                 )
THE ILLINOIS CIVIL SERVICE COMMISSION,    )
CHRIS KOLKER, RAYMOND EWELL, BARBARA      )
J. PETERSON, ARES G. DALIAOIS, and        )
BETTY BUKRABA,                            )     Honorable
      Defendants-Appellees and            )     Patrick W. Kelley,
      Cross-Appellees.                    )     Judge Presiding.
_____

      PRESIDING JUSTICE MYERSCOUGH delivered the opinion of the court:

      The Illinois Department of Human Services (Department) appeals the decision of the Illinois Civil Service Commission (Commission), Chris Kolker, Raymond Ewell, Barbara J. Peterson, Ares G. Daliaois, and Betty Bukraba, to suspend Candy Porter in lieu of discharge. Porter cross-appeals, arguing (1) the circuit court had jurisdiction to consider the issues raised by Porter in her counterclaim for administrative review and (2) the Commission's finding that Porter committed abuse was against the manifest weight of the evidence. We affirm.

I. BACKGROUND

      For 18 years, Porter worked as a mental-health technician II at Murray Developmental Center (Center) in Centralia,

Illinois.  The Center is operated by the Department.

Porter worked in Fir Cottage, which housed very low functioning, developmentally disabled adults, most of whom were nonverbal.  Porter's responsibilities included feeding and bathing the residents.

In September 2006, a coworker, Sandra Coats, accused Porter of two separate incidents of abuse against residents of Fir Cottage: (1) squeezing the hands of three residents to force them to eat and (2) hitting a resident on the back of the head and yelling "stop that rocking."

### A. The Charges Against Porter

The office of Inspector General (OIG) investigated the allegations against Porter.  In December 2006, OIG filed a report on each incident, finding both allegations of abuse substantiated.  On January 11, 2007, a predisciplinary hearing was held.

On February 8, 2007, the Illinois Department of Central Management Services (CMS) sent Porter the Department's two written charges of recipient abuse and notified her that the Department was seeking her discharge.  The statement of charges alleged as follows:

> "CHARGE [No.] 1:    RECIPIENT ABUSE, in that during the week prior to September 1, 2006, Ms. Candy Porter, [m]ental [h]ealth [t]echnician II at the Murray Developmen-

- 2 -

tal Center, working first shift on Fir Cottage, B1 unit, was seen to be 'squeezing' the hands of D.B., J.S., and S.G. in an effort to force these individuals to eat their meals.

CHARGE [No.] 2:    RECIPIENT ABUSE, in that on or about September 1, 2006, at approximately 10:30 a.m., Ms. Candy Porter, [m]ental [h]ealth [t]echnician II at the Murray Developmental Center, while working first shift on Fir Cottage, B1 unit, used her left hand to hit individual [J.D.] in [sic] the back of the head and yelled 'stop that rocking.'"

Testimony at the March 2007 hearing established that charge No. 2 contained a typographical error that identified the resident as S.D. when in fact the resident was J.D.  Porter affirmed at the

- 3 -

hearing that she knew the allegation was that she struck J.D.

The charges alleged that Porter violated the following rules, regulations, policies, and procedures: (1) the Department's employee handbook, indicating that violation of any Department policy or regulation could result in disciplinary action up to and including discharge; (2) the Department's administrative directive No. 01.02.03.040, providing that an employee who fails to comply with Department rules will be subject to discipline up to and including discharge; (3) the Center's standard operating policy and procedure No. 320, prohibiting the mistreatment of mentally ill or developmentally disabled individuals and providing that an employee found guilty of mistreatment will be subject to discharge; (4) the Center's standard operating policy and procedure No. 11.1, defining abuse and requiring the reporting of abuse; (5) the Department's program directive No. 02.01.06.010, providing that it is a violation of Department policy to abuse an individual and that any employee who abuses an individual is subject to discipline, up to and including discharge; and (6) the Department's policy and procedure directive No. 01.05.06.08, providing that an employee who abuses a recipient may be subject to discipline, up to and including discharge. Porter requested a hearing with the Commission.

B. Evidence Presented at the Hearing

At the March 7, 2007, hearing, the Department presented six witnesses: Porter (called as an adverse witness); Bradley

- 4 -

Davis, the OIG investigator; Coats; coworker Stacy Bryant; Connie Eversgerd, the Center's labor-relations administrator; and Jamie Veach, the Center's director. Porter testified on her own behalf and also called Eversgerd and Veach.

Coats testified she had known Porter for over 20 years, having worked with her at the Center as well as a previous nursing home. Coats and Porter got along well and had no problems. Porter also testified that she and Coats had a positive working relationship. Porter referred to Coats as "grandma" or "G-ma."

Coats testified that around September 1, 2006, she returned to the living room of the unit a few minutes early after her lunch break. Other residents were in the living room, but no other staff members were present. Coats saw Porter sitting on a couch next to J.D. with her arm around him.

Porter testified that J.D. often rocked back and forth. Workers were directed to prompt him to stop rocking because the rocking sometimes caused J.D. to vomit. Coats testified that on other occasions, Porter had told her, matter of factly, that it aggravated her (Porter) when J.D. rocked.

Coats testified that as she entered the room, she saw Porter slap J.D. on the back of the head and heard Porter tell J.D. to "stop that rocking." When asked about J.D.'s reaction to the slap, Coats testified, he "snapped forward and came back." Coats agreed it would take a significant amount of force to knock J.D. forward, but J.D. did not make a sound. The slap itself did

not make a sound either. However, Coats testified the room was "somewhat noisy."

After seeing Porter hit J.D., Coats told Porter, "Leave that boy alone." Porter stood up and said she was leaving for lunch.

Shortly after the incident, Coats told coworker Bryant what happened and asked Bryant if she had heard anything. Coats could not remember what Bryant told her. However, on September 7, 2006, Coats told OIG Investigator Davis that Coats thought Bryant had heard Coats say "Leave that boy alone." As of the date of the hearing, Coats was no longer sure whether Bryant heard anything.

According to Coats, Bryant told the cottage director, Debbie Dunnavan, what happened. The first time Coats talked to any supervisor about the incident was September 7, 2006.

When asked whether she had ever seen Porter act inappropriately toward other residents, Coats testified that she witnessed Porter squeeze the hands of three residents, D.B., J.S., and S.G., while feeding them. Coats believed it occurred about a week before the J.D. incident, which occurred around September 1, 2006. Coats could not recall at which meal it occurred (although Investigator Davis testified that Coats told him it occurred during breakfast).

Coats testified that she saw Porter feeding D.B. Coats was approximately 10 feet away at another table. Nothing obstructed her view. Coats saw Porter squeezing D.B.'s fingers.

D.B. pulled back, straightened his legs, and grimaced. Coats asked Porter "if she wasn't squeezing that boy's hand too tight." Porter said "she didn't think so." That same day, during the same meal, Coats also saw Porter squeezing J.S.'s and S.G.'s hands too tightly. J.S. and S.G. also appeared to pull back. J.S. yelled out. Coats testified J.S. did sometimes yell out, although it was not common for J.S. to react in that manner during feeding. Other staff members were present in the room when Porter squeezed the hands. No other coworker claimed to have seen Porter squeeze residents' hands. (The written statements of four coworkers interviewed by Investigator Davis were admitted by agreement of the parties. Those documents reflect that the four coworkers reported they had never witnessed Porter squeeze the hands of residents.)

Coats did not say anything to Porter about Porter squeezing J.S.'s and S.G.'s hands. Coats testified she should have reported the hand squeezing but did not. The first time Coats reported the hand squeezing to a supervisor was when she was "called on the carpet" for not reporting the September 1, 2006, incident regarding J.D. When asked why she waited to report the hand squeezing, Coats said she was not sure. When asked why she disclosed the information at all, Coats testified the information needed to be turned in, and she was there to protect the residents. However, Porter was her friend, and Coats was sad that Porter was discharged. Coats testified she received a written reprimand for failing to report the alleged

abuse of J.D., D.B., J.S., and S.G.  (Eversgerd, however, testified Coats received an oral reprimand.)

Bryant, a mental-health technician II, testified only regarding certain uncharged conduct that the administrative law judge (ALJ) admitted over objection on the ground that it was admissible only for the purpose of impeaching Porter's credibility.  Bryant testified the incident occurred at the evening meal on approximately September 1, 2006, although she did not believe it occurred on the same day as the incident regarding J.D. Bryant observed Porter squeeze S.G.'s hand while feeding her. Bryant told coworker Cathy McCown but did not report it to her supervisor, although she knew she was required to report it. Bryant testified she received a written reprimand for failing to report the incident.  (Eversgerd, however, testified Bryant received an oral reprimand.)

Porter testified that she had worked at the Center from February 1988 through the fall of 2006.  She knew that physical abuse of a resident was absolutely prohibited.  Porter agreed that squeezing hands or striking a resident on the back of the head constituted physical abuse, but she denied having done so. Porter denied slapping J.D.  Porter testified that it was not difficult to get J.D. to stop rocking and that slapping him on the head might cause him stress and induce him to vomit.  Moreover, Porter testified the couch where the incident allegedly occurred was in full view of the nurse's aide station.  However, she did not recall if anyone was at the nurse's aide station at

the time.

Porter also denied squeezing any of the residents' hands.  Porter testified that she would face no adverse consequences if the residents did not eat and agitating them or causing them pain would not cause them to eat.  In addition, D.B. and S.G. had feeding tubes and could be fed that way if they did not eat or drink enough.  Moreover, Porter did not recall Coats saying something to her about holding a resident's hand too tightly.

According to Porter, it was not uncommon to gently hold a resident's hand while feeding.  She did not recall, however, whether she told Investigator Davis that she never held the residents' hands while feeding them.  The following exchange between Porter and the assistant Attorney General occurred regarding Porter's handwritten statement to Investigator Davis:

"Q.  Okay.  I'm going to refer you to what is A-4, page three of three on your report.  It was asked to [sic] you, 'have you ever held their hands while feeding?'  Could you tell me what your response is there?

A.  'No.'

Q.  Okay.  And it's my understanding that you just testified that you do hold their hands while you're feeding?

A.  Well, just like holding like this, but I'm not like talking like holding a grip,

- 9 -

no.

Q. Okay. And I believe you were also asked here if you squeezed their hands, and you reported no; right?

A. Yeah, I don't squeeze hands, no.

Q. Okay. And then you were actually asked if all you do is ever hold their hands while feeding, and your response to that question was [']no[']. It wasn't [']sometimes.['] It wasn't [']maybe['']. It wasn't [']I don't recall.['] It was [']no['']; is that correct?

A. Yes."

Porter's written statement to Investigator Davis provided, in part, as follows:

"[S.G.] on a good day, feeds herself, you might have to help to finish up her meal. When you have to help, she will usually hold her head up & if not I will put *** a couple of my fingers under her chin to help hold it up.

[D.B.] I have no problem with him, if he knows it is me feeding him, he will hold his head up the entire time [and] laugh at me.

[J.S.] is fed. If he will not hold his head up I will also put [two] fingers under

- 10 -

his chin to help hold his head up.

[Q.]  When is it necessary to hold a person that we serve's [sic] hand during feeding a meal?

[A.]  Never that I know of!

[Q.]  Have you squeezed the hands of Mr. S[.] while feeding?

[A.]  No--it would make him mad--then he would not eat.

[Q.]  Did you squeeze Ms. G[.'s] hand to get her to eat?

[A.]  No--she feeds herself for the most part.

[Q.]  Did you squeeze Mr. B[.'s] hand while feeding him?

[A.]  No--he always eats good for me.

[Q.]  When you are feeding the people we serve, where are your hands?

[A.]  My left one has the spoon [and] my right is either holding the plate or two fingers under their chin if necessary.

[Q.]  Have you ever held their hands while feeding?

[A.]  No.

[Q.]  Is there a reason that you aware of why anyone would allege that you squeeze

their hands to get them to eat?

[A.] Not to my knowledge."

Davis, the OIG investigator, testified that he investigated the two separate allegations of abuse against Porter. In both cases, Davis found the allegations substantiated. Davis testified that when he interviewed Porter, she was not cooperative. However, Porter denied in writing and orally that she abused any residents.

Davis was unable to establish a date for the hand-squeezing incident but found the incident occurred approximately one week prior to September 1, 2006, at the breakfast meal. Davis testified that no one corroborated Coats' testimony.

The ALJ admitted the OIG reports "to the extent that the[] documents were relied upon by [the Department] in making the decision to discharge Porter." In addition, Porter's statement to Investigator Davis about the hand-squeezing incident was also admitted as a statement inconsistent with Porter's testimony at the hearing.

Several individuals testified about the appetite logs. An appetite log is a document that contains a list of the residents' names, a place to mark how much each resident ate or drank, and a place for the initials of the "monitor." Porter's initials did not appear next to the name of D.B., J.S., or S.G. on any of the breakfast appetite logs for August 23, 24, 25, 26, or 27.

Veach, the Center director, and Eversgerd, the labor-

relations administrator, both testified that the appetite logs were supposed to be accurate and, if they became aware of inaccuracies, the inaccuracies would be investigated. However, Coats testified that the purpose of the appetite logs was to keep track of how much the residents ate and drank at meals. Although the person that fed a particular resident was supposed to initial the appetite log, that did not always happen. Coats testified that sometimes the appetite log did not get filled out or someone else asked how the resident ate and signed off on the appetite log. Coats had also observed occasions when one person fed a resident and his or her initials did not appear on the appetite log. However, if an individual does initial the sheet, that means he or she at least had some role in feeding the resident. Coats did not recall whether anyone other than Porter fed D.B., J.S., and S.G. the day she saw Porter squeezing their hands. However, when asked whether, to the best of her knowledge, Porter was the only one who fed D.B., J.S., and S.G. on the day in question, Coats responded, "yes." According to Coats, Porter should have initialed the appetite logs that day. When asked if it was a violation for Porter to have fed the individuals and not put her initials, Coats said it was, but that "[i]t happens all the time."

Investigator Davis testified that he was familiar with appetite logs. Davis testified that the appetite logs were supposed to be completed accurately and complete but that was not always the case. The initials were not always accurate because

one person may start to feed a resident and another staff member may step in. Moreover, Davis testified that the purpose of the appetite logs was to monitor food intake, not track who fed each resident. He used the appetite logs only to identify witnesses.

Porter testified that the appetite logs should contain the initials of the person who fed the resident. If more than one person feeds a resident, both initials should be listed, but that does not always occur. Porter testified the appetite logs did not show her feeding D.B., J.S., or S.G. breakfast any of the days between August 23 and August 27, 2006. The Department tendered, but the ALJ ultimately refused to consider, one appetite log for lunch and one appetite log for dinner the week prior to September 1, 2006.

Veach, the Center director, testified he was the final decision maker. He reviewed the OIG reports but did not take that information into consideration when determining whether Porter should be discharged. Veach explained that if the report "states it's a substantiated case of abuse, it's automatic discharge." This was based on Department of Human Services Secretary Carol Adams' unwritten zero-tolerance policy.

Veach also testified that a medical examination is required after an allegation of abuse is made. Over a hearsay objection, Veach testified that he had reviewed a report from a doctor who examined the residents. The report indicated one resident--Veach believed it was D.B., but he was not sure-- required a follow-up for a nondisplaced fracture on the left

hand, fourth metacarpal. By the time the specialist saw the resident, the specialist could not determine the date the injury occurred because the injury had already begun to heal.

Eversgerd testified she was familiar with Porter's personnel file. Porter only had one prior disciplinary action relating to "some sick time usage many years ago." Porter had good evaluations. Eversgerd also came across language in Porter's personal file characterizing her as a caring employee. Porter had no prior reports of abuse or neglect. However, because of the substantiated allegation of abuse, termination was automatic. When asked the license ramifications for an employee who abused a resident, Eversgerd testified that the employee's name will be placed on the "[Nurse] Aide Registry," which prevents an employee from working around residents cared for through the State.

Due to the employees' failures to report the suspected abuse by Porter, the Department of Public Health placed the Center on "immediate jeopardy," the second highest level of discipline a facility can receive short of decertification. An "immediate jeopardy" required a 10-day action plan be submitted to the Department of Public Health, which is then reviewed by CMS. In response to the "immediate jeopardy," Veach implemented a policy increasing the punishment for a failure to report from progressive discipline (oral warning, written reprimand, et cetera) to a 10-day suspension for a first violation, 20-day suspension for a second violation, and discharge for a third

violation.

C. The ALJ's Recommended Decision

On July 19, 2007, the ALJ entered a recommended decision that the written charges for discharge be found proved and that "sound public opinion recognized the prove[d] charges as good cause for *** Porter to no longer hold the position of [m]ental[-h]ealth [t]echnician II." The ALJ found that the matter came down to the credibility of two witnesses and that Coats was more credible than Porter. The ALJ noted that Coats and Porter got along professionally and personally, and Coats did not have a bias against Porter or a motive to testify falsely. Coats' testimony that she witnessed Porter slap J.D. and squeeze the hands of D.B., J.S., and S.G. was credible. The ALJ found "nothing in [Coats'] tone, demeanor[,] or in the content of her testimony to indicate that Coats was lying, mistaken[,] or testifying falsely against Porter."

The ALJ further found that Porter received good work evaluations, had no previous discipline, and appeared to care about the residents she served. However, the ALJ found Porter was not credible:

> "Again, Porter flat out denied the charges.
> Porter did not state that she might have
> squeezed the residents' hands, or touched
> J.D.'s head, simply to get the residents'
> attention. She did not testify that there
> might have been physical contact as witnessed

by Coats but there was no harm, and/or intent to harm, the residents. Rather, Porter testified that the events described in the charges simply did not happen."

The ALJ also found Porter's statements regarding charge No. 1 were "inconsistent." Porter initially told Investigator Davis she never held the residents' hands while feeding them. At the hearing, however, Porter testified that she might "gently" hold a resident's hand during the meal. Coats and Bryant offered credible testimony that they each witnessed Porter squeezing the hands of residents while feeding them, in direct contradiction to Porter's assertion that she never squeezed residents' hands.

The ALJ also concluded:

"Despite over 18 years of public service with the State of Illinois, no prior discipline, positive work evaluations, and an indication of genuine empathy for the residents she served, sound public policy warrants the discharge of [Porter.] Throughout this case, [Porter] has flat out denied the allegations (as opposed to acknowledging that the events giving rise to the charges might have happened but the degree of force was misinterpreted or exaggerated by Coats). However, the preponderance of the evidence indicates Porter used physical force--a force

that was not 'gentle'--to manipulate the residents' conduct.  This behavior was not necessary, nor reasonable, and it falls squarely under the definition of mistreatment and/or abuse.  For the most part, the residents of Fir Cottage have the intellectual capacity of infants.  Most residents are nonverbal, barely able to meaningfully communicate with others.  In sum, they are defenseless and the behavior described in the charges, and ultimately proved at the hearing, is the antithesis of Porter's duty as a [m]ental[-h]ealth [t]echnician II: to protect and care for the residents.  For these reasons, sound public policy warrants the discharge of [Porter.]"

D. The Commission's Decision

In July 2007, Porter filed objections to the recommended decision, including objections to the ALJ's (1) credibility findings; (2) failure to give weight to the appetite logs showing Porter did not feed D.B., J.S., and S.G. breakfast during the time in question; and (3) failure to give any weight to the argument that Porter was denied her right to due process and to adequately defend against the charges because Porter did not know the date the abuse allegedly occurred.

On July 19, 2007, the Commission, with one member

- 18 -

dissenting, modified and adopted the recommended decision of the ALJ:

"It is hereby determined that the written charges for discharge approved by the Director of [CMS], have been prove[d], but the unique factual circumstances surrounding the discharge did not rise to the level which sound public policy recognized as good cause for the employee to no longer hold the position.  This is supported by [Porter's] 18 years of service to the State and the lack of a discipline on her record.  The Commission expressly finds that [Porter] committed the actions she is charged with, but in no way is this to be interpreted to mean that unwarranted physical contact with clients is an undisciplineable [sic] offense.  The said prove[d] charges warrant a 90-day suspension in lieu of discharge.  It is further recommended that [Porter] undergo any available training regarding the care of residents under her charge.  This is a final administrative order subject to the Administrative Review Act."

E. The Circuit Court Proceedings Affirming the Commission

On August 21, 2007, the Department filed a complaint

for administrative review. The Department asserted that the Commission's decision to suspend Porter for 90 days in lieu of discharge was arbitrary and capricious, contrary to mandatory Department policies, legally erroneous, and contrary to sound public policy.

On September 6, 2007, Porter answered the complaint and filed a counterclaim for administrative review. In her counterclaim, Porter sought administrative review of the Commission's decision to the extent it adopted the factual findings of the ALJ and imposed any discipline on Porter. Porter requested the circuit court reverse the Commission's decision and order the Department to immediately reinstate Porter with back pay, benefits, and seniority.

In September and October 2007, the Department and the Commission, respectively, each filed a motion to dismiss Porter's counterclaim asserting the circuit court lacked jurisdiction to consider it. In January 2008, the court dismissed the counterclaim, finding the 35-day requirement jurisdictional. The court held that Porter failed to independently file a complaint for administrative review within 35 days of the Commission's decision.

The parties briefed the issue raised in the Department's complaint for administrative review. In her brief, Porter asked the circuit court to review the Commission's factual findings. Porter also asked the court to take judicial notice of two administrative proceedings.

First, Porter asked the court to take judicial notice that the Department agreed to a dismissal of its Nurse Aide Registry petition against Porter. Porter attached (1) a February 2, 2007, letter to Porter from OIG Investigator Davis notifying Porter that due to the substantiated allegation of physical abuse, OIG would report her identity and the findings to the Nurse Aide Registry and (2) an August 21, 2007, notice of dismissal in a Department of Human Services proceeding (Nos. 07-NAR-006, 07-NAR-007, OIG No. 5807-04, and OIG No. 5807-005), noting receipt of a stipulated agreement between the Department and Porter and Porter's request that "her appeal be withdrawn."

Second, Porter asked the circuit court to take judicial notice of the final administrative order and decision and recommendation of Chief ALJ Naomi Bean Dunn's decision in Department of Public Health, State of Illinois v. Candy Porter, No. CNA 07-0013, pertaining to the same allegations as the instant case. Porter argued that "[b]ased upon the exact same charges and the same witnesses, the Department of Public Health found the same charges to be unsubstantiated and refused to revoke [Porter's] CNA [(certified nursing assistant)] license or to impose discipline on Porter." Porter attached (1) the January 17, 2008, final order adopting the recommendations of the ALJ and providing "[t]he finding and allegations of resident abuse is NOT AFFIRMED and SHALL NOT be included in the Nurse Aide Registry"; and (2) the ALJ's recommended decision, dated January 15, 2008, in which the ALJ found Porter credible, did not find Coats' testimony

credible, found that the behaviors witnessed by Coats did not rise to the level of abuse as "defined by the Act," and found the Department had not proved that Porter committed the abuse.

On September 17, 2008, the circuit court held a hearing. No transcript of the hearing is contained in the record on appeal.

On October 16, 2008, the circuit court entered a written order. The court declined to take judicial notice of the documents attached to Porter's brief that were outside the administrative record. The court also declined Porter's request to review the Commission's factual findings because she did not timely file a complaint for administrative review seeking review of the factual findings. The court reviewed the Commission's decision that Porter's abuse of the residents did not meet the standard for discharge and applied the clearly erroneous standard to its finding. The court held:

> "5. The Commission is the agency charged with administering the regulation at issue [(80 Ill. Adm. Code §1.170, as amended by 19 Ill. Reg. 12451 (eff. August 21, 1995))] and is presumably in touch with what sound public opinion would recognize as good cause for discharge. Moreover, the [c]ourt does not find it was error for the Commission to consider [Porter's] 18-year unblemished work record, as the regulation specifically pro-

- 22 -

vides for consideration of performance record and length of continuous service.

6. Accordingly, in light of the [c]ourt's duty to give due deference to the Commission as the agency charged with applying its own regulation and its obligation to be in touch with what sound public opinion would recognize as good cause for discharging [Porter], the [c]ourt does not find the Commission's decision to impose a 90-day suspension on [Porter] in lieu of discharge was clearly erroneous."

This appeal and cross-appeal followed.

## II. ANALYSIS

In its appeal, the Department argues the Commission's decision not to discharge Porter should be reversed. In her cross-appeal, Porter argues (1) the circuit court had jurisdiction to consider the issues raised by Porter in her counterclaim for administrative review; and (2) the Commission's finding that Porter committed abuse was against the manifest weight of the evidence. Both Porter and the Commission argue that the Commission's decision to suspend Porter in lieu of discharge should be affirmed. Equip for Equality, Inc., filed an amicus curiae brief on behalf of the Department. We first address jurisdiction.

### A. The Trial Court Had Jurisdiction Over Porter's Counterclaim

In her cross-appeal, Porter argues the circuit court

had jurisdiction to consider the issues raised by Porter in her counterclaim for administrative review.  The Commission argues that the circuit court did not have jurisdiction over Porter's counterclaim for administrative review because Porter did not seek review within the time and manner provided by the Administrative Review Law--within 35 days of receipt of the Commission's decision.  735 ILCS 5/3-101 through 3-113 (West 2008).  The Department adopted the Commission's argument.

Section 11a of the Personnel Code provides that final administrative decisions of the Commission are subject to judicial review pursuant to the Administrative Review Law (735 ILCS 5/3-101 through 3-113 (West 2008)).  20 ILCS 415/11a (West 2008); see also 80 Ill. Adm. Code §1.300, as amended by 19 Ill. Reg. 12451 (eff. August 21, 1995) ("All final decisions of the Commission shall be subject to appeal by the parties to the proceedings under the Administrative Review Act").  Under the Administrative Review Law, circuit courts are vested with jurisdiction to review final administrative decisions.  735 ILCS 5/3-104 (West 2008).  To obtain review of a final administrative decision, an action must be commenced within 35 days of service of the decision:

> "Every action to review a final administrative decision shall be commenced by the filing of a complaint and the issuance of summons within 35 days from the date that a copy of the decision sought to be reviewed was served upon the party affected by the

- 24 -

decision ***."  735 ILCS 5/3-103 (West 2008).

See also 80 Ill. Adm. Code §1.300, as amended by 19 Ill. Reg. 12451 (eff. August 21, 1995) (providing for appeal of a final decision of the Commission by filing a complaint and issuing summons within 35 days from the date the decision was served on the party affected).  "Unless the action is commenced within the 35 days, the trial court lacks subject[-]matter jurisdiction and the complaining party is barred from obtaining judicial relief." McGaw Medical Center of Northwestern University v. Department of Employment Security, 369 Ill. App. 3d 37, 40, 860 N.E.2d 471, 474 (2006) (affirming the dismissal of the plaintiff's complaint for administrative review for failure to name the Board).

The Commission argues that Porter was required to file her cross-complaint for administrative review within 35 days of her receipt of the Commission's decision.  According to the Commission, because Porter did not do so, the circuit court lacked subject-matter jurisdiction over her counterclaim.  We disagree.

The Administrative Review Law requires that an action be commenced within 35 days of service of the final administrative decision.  735 ILCS 5/3-103 (West 2008).  That occurred here.  When the Department filed a complaint for administrative review within 35 days of the Commission's decision, the circuit court was vested with subject-matter jurisdiction over the entire matter, including the issue raised in Porter's counterclaim, pursuant to section 3-110 of the Administrative Review Law:

"Every action to review any final admin-
istrative decision shall be heard and deter-
mined by the court with all convenient speed.
The hearing and determination shall extend to
all questions of law and fact presented by
the entire record before the court."  735
ILCS 5/3-110 (West 2006).

Given the plain language in section 3-110, once the action was timely filed by the Department, the court had the authority to hear and determine all questions of law and fact presented by the entire record.  This included the Commission's decision that Porter had committed the abuse.  See, e.g., Huff v. Rock Island County Sheriff's Merit Comm'n, 294 Ill. App. 3d 477, 482, 89 N.E.2d 1159, 1164 (1998) (addressing the trial court's finding of neglect of duty where it appears the employee only challenged his demotion and suspension; appellate court noted that the review of an administrative decision extends to all questions of law and fact presented by the record); Washington v. Civil Service Comm'n, 120 Ill. App. 3d 822, 827-28, 458 N.E.2d 952, 956 (1983) (holding that the filing of the cross-complaint did not consti-tute the commencement of review and that the proceeding was commenced within the 35-day period when the plaintiff filed his complaint for review; but also incorrectly holding that the 35-day timing requirements were procedural, not jurisdictional, limitations); Colaw v. University Civil Service Merit Board of the University Civil Service System, 37 Ill. App. 3d 857, 860-61,

341 N.E.2d 719, 722 (1975) (rejecting the argument that the plaintiff forfeited the issue of whether the remand procedure was proper by not objecting in the trial court; the appellate court could review all questions of law and fact presented by the record).

This conclusion is supported by the analogous procedure in workers' compensation cases. Section 19(f)(1) of the Workers' Compensation Act provides that a proceeding for judicial review must be commenced within 20 days of notice of the Illinois Workers' Compensation Commission's decision. 820 ILCS 305/19(f)(1) (West 2008). Similar to the Administrative Review Law, the Workers' Compensation Act gives the circuit court, "by summons to the Commission[,] [the] power to review all questions of law and fact presented by such record." 820 ILCS 305/19(f)(1) (West 2008). In Hurt v. Industrial Comm'n, 191 Ill. App. 3d 733, 738, 548 N.E.2d 122, 126 (1989), this court noted that an opposing party is not required to file its own summons to preserve his, her, or its "right to object to questions arising on the record or questions involved in the decision reviewed." Hurt, 191 Ill. App. 3d at 738, 548 N.E.2d at 126 (holding that "[t]he summons issued to the Commission upon the written request of the instant claimant brought before the circuit court the employer's objections to the Commission's award").

Moreover, section 1-108 of the Code of Civil Procedure (Code) provides that the civil-practice provisions contained in article II of the Code apply to article III proceedings (the

- 27 -

provisions pertaining to administrative review), except as otherwise provided in article III.  735 ILCS 5/1-108 (West 2008). One of the provisions contained in article II of the Code is section 2-608, which defines a "counterclaim" as any claim by a defendant against a plaintiff and provides that a "counterclaim shall be part of the answer."  735 ILCS 5/2-608(a), (b) (West 2008).

The Administrative Review Law requires the filing of an answer by an agency and permits the filing of an appearance by any other defendant within the time provided by supreme court rules.  735 ILCS 5/3-106 (West 2008).  The time within which to file an appearance under the supreme court rules is 30 days.  See 166 Ill. 2d R. 101(d).

The Administrative Review Law does not prohibit the filing of an answer by a party other than the agency.  Here, Porter filed an answer within 30 days of service.  As part of that answer, she filed a counterclaim.  The filing of the counterclaim was not prohibited nor does the Administrative Review Law "otherwise provide."  Consequently, Porter's counterclaim was timely filed under the supreme court rules, and the circuit court had jurisdiction to consider the counterclaim.

Therefore, the circuit court erroneously determined it lacked jurisdiction over Porter's counterclaim.  However, because this court reviews the Commission's decision and not the trial court's decision, remand is not required.  See, e.g., Kimball Dawson, LLC v. City of Chicago Department of Zoning, 369 Ill.

App. 3d 780, 786, 861 N.E.2d 216, 222 (2006) (appellate court reviews the decision of the administrative agency, not the circuit court).

### B. The Commission's Finding That Abuse Occurred Was Not Against the Manifest Weight

Porter raises several arguments related to the Commission's decision that Porter committed abuse. Porter argues (1) she did not have adequate notice of the charges; (2) the Commission applied the wrong standard for the burden of proof because, when a crime is charged in a civil administrative hearing, the evidence proving such a crime should be by clear and convincing evidence; and (3) the finding that the Department sustained its burden of proof was against the manifest weight of the evidence.

### 1. <u>Standard</u> <u>of</u> <u>Review</u>

The standard of review in cases involving the Administrative Review Law depends upon whether the issue is one of fact or law. <u>Exelon Corp. v. Department of Revenue</u>, 234 Ill. 2d 266, 272, ___ N.E.2d ___, ___ (2009). Factual questions are reviewed under the manifest-weight-of-the-evidence standard, questions of law are reviewed <u>de</u> <u>novo</u>, and mixed questions of fact and law are reviewed for clear error. <u>Exelon</u>, 234 Ill. 2d at 272-73, ___ N.E.2d at ___.

In discharge cases, "[t]he scope of review of an administrative agency's decision regarding discharge is generally a two-step process involving first, a manifest-weight standard, and second, a determination of whether the findings of fact provide a sufficient basis for the agency's conclusion that cause

for discharge does or does not exist." <u>Brown v. Civil Service</u> <u>Comm'n</u>, 133 Ill. App. 3d 35, 39, 478 N.E.2d 541, 544 (1985), citing <u>Department of Mental Health & Developmental Disabilities</u> <u>v. Civil Service Comm'n</u>, 85 Ill. 2d 547, 550, 426 N.E.2d 885, 887 (1981); see also <u>Hermesdorf v. Wu</u>, 372 Ill. App. 3d 842, 851-52, 867 N.E.2d 34, 43 (2007).

### 2. <u>Porter</u> <u>Had</u> <u>Adequate</u> <u>Notice</u> <u>of</u> <u>the</u> <u>Charges</u>

Porter argues she did not have adequate notice of the charges against her. Porter asserts she was forced to defend against a charge that only specified she abused three residents during the week prior to September 1, 2006. Porter also argues that Coats' delay in reporting the incident regarding J.D. also deprived her of the opportunity to properly "respond and defend."

Porter raised this issue in her objection to the ALJ's recommendation and raised the issue in her briefing to the circuit court. However, Porter does not support her argument on appeal with citation to authorities. See 210 Ill. 2d R. 341(h)(-7) (requiring that argument contain citation to authorities). Therefore, the issue is forfeited. See <u>Orzel v. Szewczyk</u>, 391 Ill. App. 3d 283, 287, 908 N.E.2d 569, 573 (2009) (providing that where a party fails to cite supporting authority, the issues may be considered forfeited).

Even if this court were to address the issue, we would find that Porter had adequate notice. The Commission's regula-tions require the charges be "specific enough to apprise the employee of the nature and substance of the cause alleged for

discharge."  80 Ill. Adm. Code §1.160(a), as amended by 19 Ill. Reg. 12451 (eff. August 21, 1995).  The regulations also require the charges be set forth in separate paragraphs and contain "the dates, names of persons, places, and facts necessary to properly allege cause."  80 Ill. Adm. Code §1.160(b), as amended by 19 Ill. Reg. 12451 (eff. August 21, 1995); see also <u>Abrahamson v. Illinois Department of Professional Regulation</u>, 153 Ill. 2d 76, 93, 606 N.E.2d 1111, 1119 (1992) (due process requires that charges in an administrative decision need only advise the respondent of the charges so that she can prepare a defense).

Here, the charges apprised Porter of the approximate date, the names of persons involved, and the places where the incidents allegedly occurred.  Porter had adequate notice.  See, e.g., <u>Morgan v. Department of Financial & Professional Regulation</u>, 388 Ill. App. 3d 633, 668, 903 N.E.2d 799, 828 (2009) (holding that where the complaint contained specific allegations of misconduct, specific citations to the regulatory provisions alleged to have been violated, and a general time period--"'in or about December 2004'"--the respondent was given adequate notice of the charges against him).

### 3. <u>The</u> <u>Commission</u> <u>Properly</u> <u>Applied</u> <u>Preponderance</u> <u>Standard</u> <u>of</u> <u>Proof</u>

Porter next argues that the Commission applied the wrong standard of proof.  Porter argues that when a crime is charged in a civil administrative hearing, the evidence proving such a crime should be clear and convincing.

Porter has forfeited this argument by not raising it

before the ALJ, the Commission, or the circuit court.  See <u>Smith</u> <u>v. Department of Professional Regulation</u>, 202 Ill. App. 3d 279, 286-87, 559 N.E.2d 884, 889 (1990) (finding the plaintiff forfeited the argument that the ALJ applied the wrong standard of proof by failing to raise the issue before the ALJ or the Board).

Even if Porter had not forfeited the issue, the Commission clearly applied the appropriate standard of proof.  Notably, the Commissions's regulations require only proof by a preponderance of the evidence.  See 80 Ill. Adm. Code §1.232(a), as amended by 19 Ill. Reg. 12451 (eff. August 21, 1995).  Moreover, under the required balancing test established by the supreme court in <u>Board of Education v. State Board of Education</u>, 113 Ill. 2d 173, 194, 497 N.E.2d 984, 993 (1986), the preponderance burden of proof was appropriate.

In <u>Board of Education</u>, 113 Ill. 2d at 194, 497 N.E.2d at 993, the Illinois Supreme Court held that due process did not require a clear and convincing standard of proof in a tenured-teacher dismissal proceeding even where the conduct charged might also constitute a crime.  In that case, when determining the appropriate burden of proof, the court balanced the private interests affected by the proceeding, the countervailing governmental interest, and the risk of error created by the government's chosen procedure.  <u>Board of Education</u>, 113 Ill. 2d at 190-91, 497 N.E.2d at 991.

Under the first balancing factor--the private interest affected--the supreme court examined the nature of the private

- 32 -

interest threatened and the permanency of the threatened loss. Board of Education, 113 Ill. 2d at 192-93, 497 N.E.2d at 992. The supreme court concluded that teachers have an economic interest in their position, but that monetary interests are adequately protected by the preponderance standard. Board of Education, 113 Ill. 2d at 192, 497 N.E.2d at 992. Moreover, although teachers have an interest in teaching as a profession, the court found that was an interest shared by teachers dismissed for noncriminal conduct as well as criminal conduct. Board of Education, 113 Ill. 2d at 192, 497 N.E.2d at 992. The court also noted that dismissal does not prevent a teacher from teaching; therefore, the threatened loss was not permanent. Board of Education, 113 Ill. 2d at 192-93, 497 N.E.2d at 992 (noting that a separate hearing is provided for a teacher prior to suspension or revocation of his or her teaching certificate). The supreme court contrasted tenured-teacher proceedings with attorney disciplinary hearings. Board of Education, 113 Ill. 2d at 193, 497 N.E.2d at 992. Attorney disciplinary hearings required clear and convincing evidence, but such proceedings may result in disbarment. Board of Education, 113 Ill. 2d at 193, 497 N.E.2d at 192.

Examining the governmental interest, the supreme court noted that a school board had a legitimate interest in dismissing teachers whose conduct violated the law or those who are incompetent. Board of Education, 113 Ill. 2d at 194, 497 N.E.2d at 993. The school had an interest in applying a standard that reduces

the risk of error that may result in an unfit individual continuing to teach. <u>Board of Education</u>, 113 Ill. 2d at 194, 497 N.E.2d at 993.

Under the third balancing factor--the risk of error--the supreme court found it appropriate for the teacher and the school board to share the risk of error in dismissal proceedings in a roughly equal manner where the possible harm to each was roughly equal. <u>Board of Education</u>, 113 Ill. 2d at 194, 497 N.E.2d at 993; see also <u>Feliciano v. Illinois Racing Board</u>, 110 Ill. App. 3d 997, 1000, 443 N.E.2d 261, 264 (1982) ("The primary purpose of assigning a particular standard of proof to an adjudicatory proceeding is to minimize the risk of erroneous decisions," and the individual should not share the risk where the possible harm to the individual is greater than the possible harm to the governmental entity).

The same analysis applies here. Porter has an economic interest in her position, but that interest is adequately protected by the preponderance standard. Porter's threatened loss is not permanent (the status of her licensing was subject to a separate proceeding). The Department also has an interest in dismissing mental-health technicians who are unfit to work with residents in the facility. Because the two interests are roughly equal, both Porter and the Department should share the risk of error in the dismissal proceedings. The preponderance-of-the-evidence standard was therefore appropriate. See <u>Teil v. City of Chicago</u>, 284 Ill. App. 3d 167, 170, 671 N.E.2d 759, 762 (1996)

(finding the administrative agency properly applied the preponderance-of-the-evidence standard in case involving charges that the police officer violated department rules, which conduct also constituted a crime).

### 4. The Commission's Decision Was Not Against the Manifest Weight of the Evidence

Porter argues that under either standard--clear and convincing or preponderance of the evidence--the Commission's finding that Porter committed the abuse was against the manifest weight of the evidence.  Specifically, Porter argues that the only admissible evidence supporting the charges was the unsupported testimony by Coats, and several factors directly contradict Coats, including the following: (1) Porter denied the charges; (2) Coats failed to immediately report the incidents; (3) no one else saw the incidents; (4) the evidence established that inflicting pain on the residents would make them harder to feed; (5) Porter's initials did not appear on any of the appetite logs for the breakfast meals the week prior to September 1, 2006; (6) regarding the squeezing incident, Coats only heard noises and movements she interpreted as pain but the residents often cry out and make movements for no reason; and (7) despite the force of the blow to J.D., he did not make a sound and the slap did not make a sound.

This court reviews the Commission's decision, not the circuit court's.  Ahmad v. Board of Education, 365 Ill. App. 3d 155, 162, 847 N.E.2d 810, 817 (2006).  When reviewing the administrative agency's decision, this court presumes that the agency-

- 35 -

's findings of fact are prima facie true and correct.  735 ILCS 5/3-110 (West 2008) ("The findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct").

As stated in Exelon, 234 Ill. 2d at 272, ___ N.E.2d at ___:

> "[W]hen a court reviews an administrative agency's factual findings, it will not reweigh the evidence or substitute its judgment for that of the agency.  Rather, the court will only ascertain whether such findings of fact are against the manifest weight of the evidence."

See also Sheehan v. Board of Fire & Police Commissioners, 158 Ill. App. 3d 275, 287, 509 N.E.2d 467, 475 (1987) (the court "should limit its inquiry to ascertaining whether the findings and decision of the agency are against the manifest weight of the evidence").  An administrative agency's decision is against the manifest weight of the evidence where the court concludes that "all reasonable and unbiased persons, acting within the limits prescribed by the law and drawing all inferences in support of the finding, would agree that the finding is erroneous and that the opposite conclusion is clearly evident."  Sheehan, 158 Ill. App. 3d at 287, 509 N.E.2d at 475-76.

This court will not reweigh the evidence here or make independent determinations of credibility.  The Commission

- 36 -

adopted the ALJ's specific factual findings. The case came down to Porter's testimony against Coats' testimony. The Commission believed Coats. The Commission found the evidence indicated Coats did not have a bias against Porter or a motive to testify falsely. Coats testified Porter was her friend and she felt sad that Porter was discharged. Porter also testified that she and Coats had a positive working relationship.

The Commission found Porter's testimony not credible, in part, because she denied in her written statement to Investigator Davis that she ever held the hands of the residents while feeding them but testified at the hearing that she sometimes gently held the residents' hands. While the difference between Porter's testimony at hearing and her statement to Investigator Davis may appear factually inconsistent, when read in context, the statements may not be inconsistent but merely a matter of semantics. Nonetheless, this court will not reweigh the evidence or make credibility determinations. The Commission's findings on credibility are supported by the evidence.

Porter argues that nothing corroborated Coats' testimony and that none of the appetite logs shows Porter fed those three residents the breakfast meal during the time in question. However, evidence was presented that the appetite logs were not always accurate. More than one person may feed a resident but only one set of initials may appear on the appetite log. Although Coats did not recall that anyone else fed D.B., J.S., or S.G. on the day in question, the Commission found her observa-

tions credible.

The Commission also believed Coats' testimony about Porter hitting J.D. Porter argues it was unlikely she could hit J.D. with such force without J.D. or the slap making a sound. However, Coats testified the room was "somewhat noisy."

"[I]t is the responsibility of the administrative agency to weigh the evidence, determine the credibility of witnesses[,] and resolve conflicts in testimony." Teil, 284 Ill. App. 3d at 170, 671 N.E.2d at 762; see also Feliciano, 110 Ill. App. 3d at 1004, 443 N.E.2d at 267 (something more than conflicting testimony is necessary to find an administrative agency's credibility findings erroneous). If the record contains evidence that supports the agency's determination, it must be affirmed. Kimball, 369 Ill. App. 3d at 786, 861 N.E.2d at 222. The Commission found the abuse occurred. The evidence supports that decision.

Porter argues she was entitled to a presumption similar to the missing-evidence jury instruction. See Illinois Pattern Jury Instructions, Civil. No. 5.01 (2006) (instruction pertaining to the failure to produce evidence or a witness). Specifically, Porter argues that when a document is under the control of a party, the party does not produce it, and in all likelihood the party would have produced the document, the trier of fact may infer that the document would be unfavorable. However, the appetite logs for the breakfast meals on August 23, 2006, through August 27, 2006, were produced and did not show that Porter fed

any of the residents in question their breakfast meal.  Porter does not point to anything suggesting that additional pertinent appetite logs were withheld from her.  Therefore, Porter has not demonstrated she would even be entitled to such a presumption.

Porter also argues that Veach's testimony about one of the residents suffering a nondisplaced fracture was irrelevant and should not have been relied on by the Commission.  Porter argues Veach was a layman interpreting an unidentified X-ray report.

The applicable administrative regulation provides as follows:

> "a) Irrelevant, immaterial[,] or unduly repetitious evidence shall be excluded.  The rules of evidence and privilege as applied in civil cases in the circuit courts of Illinois shall be followed.  However, evidence not admissible under such rules of evidence may be admitted (except where precluded by stat- ute) if it is of a type commonly relied upon by reasonably prudent persons in the conduct of their affairs."  80 Ill. Adm. Code §1.233(a), as amended by 19 Ill. Reg. 12451 (eff. August 21, 1995).

Porter argues no prudent person would rely on Veach's layman's interpretation of an unidentified X-ray report.

The record contains the X-ray report finding the

nondisplaced fracture.  That document was a part of the OIG report.  However, the OIG report was admitted only to the extent the report was relied on in making the decision to discharge. Veach testified that the only thing he relied upon in making the discharge decision was the substantiated finding of abuse.  As such, it does not appear that the testimony about the nondisplaced fracture was relevant, as it was not considered by Veach in making the discharge decision.

However, even if the admission of the testimony was in error, Porter cannot show prejudice.  Section 3-111(b) of the Administrative Review Law requires a showing of prejudice:

> "Technical errors in the proceedings
> before the administrative agency or its fail-
> ure to observe the technical rules of evi-
> dence shall not constitute grounds for the
> reversal of the administrative decision un-
> less it appears that such error or failure
> materially affected the rights of any party
> and resulted in substantial injustice to him
> or her."  735 ILCS 5/3-111(b) (West 2008).

See also McCleary v. Board of Fire & Police Commissioners, 251 Ill. App. 3d 988, 993, 622 N.E.2d 1257, 1262 (1993) ("the appellate court may reverse an administrative ruling only if there is error which prejudiced a party in the proceeding").  Nothing in the record demonstrates the Commission considered such evidence. The Commission's decision was based on the credibility of Coats.

Porter did not suffer prejudice as the admission of the evidence did not affect the outcome.

Finally, Porter asks this court to take judicial notice of ALJ Dunn's decision in Department of Public Health, State of Illinois v. Candy Porter, No. CNA 07-0013, which involved the same allegations as in the instant case.  Porter asks this court to take judicial notice that, based on the exact same charges and the same witnesses, the Department of Public Health found the charges unsubstantiated and refused to revoke Porter's CNA license or impose discipline.  Porter notes that ALJ Dunn specifically found Porter's testimony credible and Coats' testimony not credible.  Porter also asks this court to take judicial notice that the Department of Human Services, which Porter identifies as the "very same entity which is the [a]ppellant in this case," dismissed its Nurse Aide Registry petition against Porter relating to these charges.

Section 3-110 of the Administrative Review Law (735 ILCS 5/3-110 (West 2008)) provides, in part, that "[n]o new or additional evidence in support of or in opposition to any finding, order, determination[,] or decision of the administrative agency shall be heard by the [reviewing] court."  However, notwithstanding section 3-110, documents containing readily verifiable facts may be judicially noticed if taking judicial notice will "aid in the efficient disposition of a case." Muller v. Zollar, 267 Ill. App. 3d 339, 341, 642 N.E.2d 860, 862 (1994).  Moreover, the appellate court can take judicial notice

even if judicial notice was not sought in the trial court. <u>Muller</u>, 267 Ill. App. 3d at 341, 642 N.E.2d at 862.

This court may take judicial notice of a written decision that is part of the record in another court or administrative tribunal because such documents fall within the category of readily verifiable facts "'which are capable of "instant and unquestionable demonstration."'" <u>Hermesdorf</u>, 372 Ill. App. 3d at 850, 867 N.E.2d at 41-42, quoting <u>May Department Stores Co. v. Teamsters Union Local No. 743</u>, 64 Ill. 2d 153, 159, 355 N.E.2d 7, 9 (1976), quoting 9 J. Wigmore, Evidence §2571, at 548 (3d ed. 1940). Therefore, this court will take judicial notice of the fact that Porter's license was not revoked and that her name is not listed on the Nurse Aide Registry. However, Porter apparently wants this court to take judicial notice of those documents to undermine the Commission's decision in this case. Porter cites no authority in support of doing so. Moreover, this court cannot reweigh evidence or independently determine credibility. Therefore, while this court will take judicial notice of the two orders, those orders do not support reversal of the Commission's decision in this case.

C. The Commission's Decision To Suspend Porter in Lieu
of Discharge Was Not Arbitrary, Unreasonable,
or Unrelated to the Requirements of the Service

In its appeal, the Department argues the Commission's decision to suspend Porter for 90 days in lieu of discharge should be reversed. The Department argues the Commission's decision was unreasonable, arbitrary, and contrary to public

policy.  Equip for Equality, Inc., filed an _amicus_ _curiae_ brief in support of the Department.  The Commission and Porter argue that the Commission's decision to suspend Porter in lieu of discharge should be affirmed.

As noted above, the "scope of review of an administrative agency's decision regarding discharge is generally a two-step process involving first, a manifest-weight standard, and second, a determination of whether the findings of fact provide a sufficient basis for the agency's conclusion that cause for discharge does or does not exist."  _Brown_, 133 Ill. App. 3d at 39, 478 N.E.2d at 544, citing _Department of Mental Health_, 85 Ill. 2d at 550, 426 N.E.2d at 887.  However, "an agency's determination of cause to discharge is not _prima_ _facie_ true and correct and is subject to judicial review."  _Brown_, 133 Ill. App. 3d at 39, 478 N.E.2d at 544.  Nonetheless, the Commission's decision "will not be reversed unless it is arbitrary, unreasonable, or unrelated to the requirements of service."  _Department of Mental Health_, 85 Ill. 2d at 552, 426 N.E.2d at 887.

The Commission's regulations define "cause for discharge exists" as follows:

"a) Cause for discharge consists of some substantial shortcoming which renders the employee's continuance in his position in some way detrimental to the discipline and efficiency of the service and which the law and sound public opinion recognize as good

- 43 -

cause for the employee no longer holding the position.

b) In determining the appropriate penalty for an offense of which the employee is found guilty, the Commission shall consider the employee's performance record and the employee's length of continuous service unless the offense would warrant immediate discharge."  80 Ill. Adm. Code §1.170(a), as amended by 19 Ill. Reg. 12451 (eff. August 21, 1995).

Pursuant to the regulations, discharge was proper where Porter's continued employment would be detrimental to the discipline and efficiency of the Center and where the law and sound public opinion recognized that good cause existed for Porter to no longer hold the position.

While the Center had an unwritten, zero-tolerance policy requiring discharge for abuse, all of the Center and Department policies contained in the record reflect that abuse would result in discipline, up to and including discharge, or that such employee would be subject to discharge.  Such language does not require discharge.  See, e.g., American Federation of State, County & Municipal Employees, AFL-CIO v. State of Illinois, 158 Ill. App. 3d 584, 590, 511 N.E.2d 749, 753 (1987) (policy stating that an employee found guilty of mistreatment "'will be subject to discharge'" was not the equivalent of

- 44 -

"<u>will/shall</u> <u>be</u> discharged" (emphases in original)).

Moreover, given Porter's employment history, good evaluations, and genuine empathy for the residents, the Commission's decision was not arbitrary, unreasonable, or unrelated to the requirements of service. See <u>Department of Mental Health</u>, 85 Ill. 2d at 550-52, 426 N.E.2d at 886-88 (affirming Commission's decision to suspend the defendant in lieu of discharge where the defendant, when punched and scratched by a patient, "'punched and kicked [the] patient who was under restraint'"; the Commission found that the reaction was not calculated but was a result of his sudden loss of control).

The Department also argues that public policy required Porter's discharge. According to the Department, suspension in lieu of discharge violated the public policy in favor of protecting the vulnerable, eliminating the risk of future harm, and deterring others. The Department borrows this terminology from arbitration cases, which provide that while review of an arbitrator's decision is very limited, a court may vacate the arbitrator's award if the award is contrary to public policy. <u>County of De Witt v. American Federation of State, County & Municipal Employees, Council 31</u>, 298 Ill. App. 3d 634, 637, 699 N.E.2d 163, 166 (1998); see also <u>American Federation of State, County & Municipal Employees, AFL-CIO v. Department of Central Management Services</u>, 173 Ill. 2d 299, 318, 671 N.E.2d 668, 678 (1996) (a court cannot enforce an arbitrator's award that violates public policy). In such cases, a two-step analysis applies: (1) the

identification of a well-defined public policy and (2) determination of whether the arbitrator's award violated public policy. De Witt, 298 Ill. App. 3d at 637, 699 N.E.2d at 166.

We question whether this analysis applies here. This is not a collective-bargaining situation where we are reviewing the parties' bargained-for labor contract. See, e.g., International Ass'n of Firefighters v. City of Springfield, 378 Ill. App. 3d 1078, 1081, 883 N.E.2d 590, 592 (2008) ("deference is accorded because the parties have chosen by contractual agreement how their dispute is to be decided, and judicial modification of an arbitrator's decision deprives the parties of their choice"). However, even if such analysis applied here, public policy did not prevent Porter's reinstatement. The parties do not dispute that Illinois recognizes a public policy of protecting those who cannot help themselves, including the protection and care for persons with developmental disabilities. Therefore, the only question here is whether reinstating Porter violates public policy. See, e.g., Jacksonville Area Ass'n for Retarded Citizens v. General Service Employees Union, Local 73, 888 F. Supp. 901, 906 (C.D. Ill. 1995) (issue was not whether the employee's past conduct violated public policy but whether reinstatement of the employee violated public policy).

The Commission adopted the ALJ's findings that Porter had no prior discipline, positive work evaluations, and indicated genuine empathy for the residents she served. The Commission determined that given Porter's years of service and lack of

discipline, a 90-day suspension was warranted in lieu of dis-
charge. The Commission also recommended further training for
Porter regarding the care of residents under her charge. Im-
plicit in these findings is that Porter was amenable to disci-
pline. See American Federation, 173 Ill. 2d at 322, 671 N.E.2d
at 680 ("as long as the arbitrator makes a rational finding that
the employee can be trusted to refrain from the offending con-
duct, the arbitrator may reinstate" the employee and the review-
ing court will affirm). Moreover, no law prohibits Porter's
employment. See, e.g., Jacksonville Area Ass'n for Retarded
Citizens, 888 F. Supp. at 908-09 (concluding that the arbitra-
tor's award reinstating employees who, to satisfy their own
curiosity, examined a mentally and/or physically impaired client
to determine if the client was a hermaphrodite, was not against
public policy where the arbitrator implicitly found they were
amenable to discipline and where no law prohibited their employ-
ment, reemployment, or reinstatement); 405 ILCS 5/3-210 (West
2008) (prohibiting an employee suspected of abuse from contact
with recipients of service until the outcome of the investigation
or disciplinary action against the employee, thus indicating that
once disciplinary action has occurred, contact is no longer
prohibited).

The case cited by the amicus, De Witt, 298 Ill. App. 3d
634, 699 N.E.2d 163, does not require a different result. In De
Witt, 298 Ill. App. 3d at 638, 699 N.E.2d at 166, this court
concluded that the arbitrator's decision to completely reinstate

- 47 -

an employee who hit a resident, without any reprimand for her behavior, was against public policy. This court found the arbitrator lacked a rational basis for concluding the employee would not repeat such conduct and did not take any precautionary steps to deter future misconduct or ensure it will not be repeated. De Witt, 298 Ill. App. 3d at 638-39, 699 N.E.2d at 166-67 (also rejecting the arbitrator's interpretation of the collective-bargaining agreement that "one incident of striking, that causes no apparent injury, does not amount to "'resident abuse'").

In contrast here, the Commission found that Porter did commit the abuse but that Porter was a good employee, had no prior discipline, and cared about the residents. Moreover, Porter received a severe discipline--a 90-day suspension--unlike the complete reinstatement with back pay awarded in De Witt. De Witt, 298 Ill. App. 3d at 639, 699 N.E.2d at 167. In addition, the Commission recommended she receive additional training, whereas in De Witt, no additional training was recommended. De Witt, 298 Ill. App. 3d at 639, 699 N.E.2d at 167. We note that in De Witt, this court recognized that in other cases where the arbitrator concluded that the employee could be trusted to refrain from future misconduct, the employee admitted wrongdoing. Porter did not admit wrongdoing here. However, Porter recognized that such conduct, if it occurred, would constitute abuse. The record supports the Commission's conclusion that Porter posed no threat for future abuse.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

TURNER and STEIGMANN, JJ., concur.