Filed 11/1/10          NO. 4-09-0971

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE ILLINOIS DEPARTMENT OF JUVENILE JUSTICE, | ) ) | Appeal from Circuit Court of |
|       Plaintiff-Appellant, | ) | Sangamon County |
|       v. | ) | No. 09MR434 |
| THE ILLINOIS CIVIL SERVICE COMMISSION; | ) | |
| CHRIS KOLKER, in His Official Capacity | ) | |
| as Chairman of the Illinois Civil | ) | |
| Service Commission; RAYMOND W. EWELL, | ) | |
| BARBARA J. PETERSON, ARES G. DALIANIS, | ) | |
| and BETTY BUKRABA, in Their Official | ) | |
| Capacities as Commissioners of the | ) | |
| Illinois Civil Service Commission; and | ) | Honorable |
| JOSIE DAY, | ) | Patrick W. Kelley, |
|       Defendants-Appellees. | ) | Judge Presiding. |

_____

JUSTICE STEIGMANN delivered the opinion of the court:

In May 2009, an administrative law judge (ALJ) recommended that codefendant, Josie Day, be discharged from her employment based on Day's admission that she tape-recorded her coworkers' conversations without their knowledge. Two weeks later, codefendants, the Illinois Civil Service Commission, Chris Kolker, Raymond W. Ewell, Barbara J. Peterson, Ares G. Dalianis, and Betty Bukraba (collectively, the Commission), adopted the ALJ's factual findings but concluded that discharge of Day was not warranted. Instead the Commission determined that a 90-day suspension constituted an appropriate sanction.

In June 2009, plaintiff, the Illinois Department of Juvenile Justice (Department), filed a complaint for administra-

tive review pursuant to section 3-108 of the Code of Civil Procedure (Civil Code) (735 ILCS 5/3-108 (West 2008)), requesting reversal of the Commission's decision to suspend Day instead of terminating her employment. Following a November 2009 hearing, the circuit court affirmed the Commission's decision.

The Department appeals, arguing that the Commission's conclusion that cause to discharge Day did not exist was arbitrary and unreasonable. We disagree and affirm.

I. BACKGROUND

A. The Circumstances Surrounding the Department's
Decision To Terminate Day's Employment

In December 1986, Day began working for the Illinois Department of Public Aid as an entry-level administrative clerk. In early 1990, Day transferred to the Department of Corrections (DOC), where she worked various clerical positions. In November 1997, Day tendered her written resignation, citing her "medical condition to smoke." In particular, Day noted that because she "found an ash tray on [her] desk with a cigarette butt and numerous ashes in it," she "would no longer expose [herself] to unnecessary smoke and stress." (At her termination hearing in this matter, Day testified that she resigned because of her husband's death.) In May 2004, DOC rehired Day as an Executive Secretary II for the (1) school superintendent of its school district and (2) chief of its medical services division.

On July 1, 2006, the legislature transferred control of

- 2 -

(1) juvenile offenders and (2) school district employees, including Day, from DOC to the newly created Department. Two weeks before the transfer, the Department's acting director, who was later appointed Department Director (hereinafter Director), scheduled a two-day executive staff conference to coordinate the transition. Because the Director knew that Day was apprehensive about the transition, he invited her to attend the conference to meet the Department's executive staff and assuage her concerns. Following the transition, Day worked at the Department's executive offices with three other employees.

In spring 2007, Day complained to a union steward about the disruptive noise level in her workplace, which she claimed was caused by her coworkers' discussions concerning weekend plans, birthdays, and "office chatter." The union did not act on Day's claim because it did not want to stifle social interaction among employees. In May 2007, Day again complained to the union steward about the noise level. The steward promptly scheduled a meeting with the Department's acting deputy director for operations (deputy). Following a June 2007 meeting, the deputy stated that he would address Day's noise complaint. Day later told the union steward in casual conversation that the executive office noise continued to be a problem. In December 2007, Day again complained to the union steward but stated that the "office chatter" was now "personal." The steward referred Day to the

Department's equal-opportunity representative because he considered Day's claim similar to a hostile-work-environment complaint.

In March 2008, Day contacted the union steward, requesting to file a grievance regarding "excessive noise level," which she claimed was dangerous to her health. One week later, Day, the union steward, and the deputy met to discuss Day's concerns. At the meeting, Day provided the deputy with a typed log, chronicling, in explicit detail, her coworkers' conversations and activities over 11 business days (March 6, 2008, through March 21, 2008). After the meeting, the deputy read the following entry from Day's log, dated March 18, 2008:

> "1:55 Billie returned from lunch and she and Lisa entered the back door chattering and laughing loudly. The atmosphere was [sic] now again very noisy. I turned on the tape recorder to caught [sic] some of it."
> (Emphasis added.)

Thereafter, the deputy (1) informed the Director about Day's log entry and (2) scheduled another meeting with Day and the union steward. At the meeting, Day admitted that she had tape-recorded her coworkers' conversations. The deputy asked Day to (1) file an incident report regarding the recording and (2) provide him the tape and Department-issued tape recorder she used to make the recordings. Thereafter, the deputy gave the tape

- 4 -

recording to the Director. The Director later listened to the recording and discovered that along with recording her coworkers' conversations during March 2008, Day had also recorded about 60 to 90 minutes of the June 2006 transition conference.

In July 2008, the Department referred Day to an employee-review hearing for violating Department standard-of-conduct rules regarding (1) employee actions that reflect poorly on the Department and (2) compliance with federal, state, and local laws. After a hearing held later that month, the hearing officer provided the Director his written report in which he (1) found that Day's conduct was not criminal but, instead, employee misconduct and (2) recommended a 60-day suspension.

The Director rejected the hearing officer's suspension recommendation, opting instead for suspension pending discharge. The Director noted that the alleged rule violations had been substantiated based, in part, on Day's admission that she tape-recorded her coworkers without their knowledge. In August 2008, the State of Illinois Central Management Services (CMS) approved the Department's discharge recommendation. Day later timely filed a written request for hearing pursuant to section 11 of the Personnel Code (20 ILCS 415/11 (West 2008)).

B. The Evidence Presented to the ALJ

Over a seven-month period (September 2008 through March 2009), the following evidence, which included the aforementioned

background, was presented by the parties to the ALJ.

1. <u>The June 2006 Recording of the Transition Conference</u>

Day explained that prior to her transition to the Department, her clerical duties with DOC included typing minutes of school board and medical service meetings. Day initially tape-recorded the school board meetings but later transcribed them by hand prior to typing them. Day continued to tape-record subsequent medical services meetings because the attendees frequently used medical terms that she wanted to accurately reflect in her typed minutes. Day estimated that she had tape-recorded six medical services meetings--five of which she re-corded and transcribed at the request of DOC's chief of medical services.

On June 15, 2006, Day attended the transitional meet-ing, which was already in progress. Day entered, found a seat at the conference table, and retrieved her planner and Department-issued tape recorder from her purse. Day placed her purse on the floor, turned on the tape recorder, and placed it on the confer-ence table. Day then placed her planner on the conference table and began taking notes.

Day stated that because she did not know what her duties would be within the new Department, she wanted to tran-scribe the transitional information related to the school dis-trict accurately. Day later listened to, typed, and filed the

minutes of the conference based on the tape recording, which she planned to disseminate to the new school district superintendent when that position was filled. (The record shows that during Day's employment with the Department, the school district superintendent position remained vacant.) Day surmised that because DOC's school district superintendent and medical services chief had previously given her permission to tape-record their respective meetings, she could also tape the transitional conference. Day later turned off the tape recorder after she determined that the information being conveyed at the conference no longer pertained to the school district.

Day admitted that at the June 2006 transitional conference (1) she did not (a) announce to the attendees that she would be recording or (b) obtain permission to record the conference, (2) no one asked her to make the recording, and (3) she did not see anyone else recording the conference.

The Director and one of Day's coworkers who attended the transitional conference both noted that after Day entered the conference, she placed her purse on the conference table. Day then sat back in her chair approximately two feet away from the conference table, taking notes on a pad of paper that she placed on her lap. The Director and coworker both stated that (1) Day did not ask for permission to tape the conference and (2) they did not see a tape recorder on the conference room table. The

deputy testified that when he listened to the recording of the conference, he did not hear the participants discuss any school-board-district issues.

The DOC medical services chief testified that Day was her part-time clerical assistant for less than a year prior to Day's transition to the Department.  During that time, the chief asked Day to attend one quarterly medical services meeting for the sole purpose of transcribing and preparing minutes of that meeting for her review.  The chief (1) could not recall whether Day had (a) tape-recorded that meeting or (b) attended other quarterly meetings and (2) did not believe that Day took notes at any other medical services meetings because she only disseminated minutes Day prepared from that quarterly meeting.

Another of Day's coworkers stated that after an exhaustive search of Day's paper and computer files, she could not find the June 2006 transition-conference minutes Day claimed to have prepared and filed.  The coworker acknowledged that she was not trained in computer forensics and had not previously performed a computer search for electronic media.  In rebuttal, Day testified that the Department had issued her a new computer in late 2007 but also admitted that the computer technicians had transferred her old computer files to her new computer.

2. The March 2008 Recording of Day's Coworkers

After the transition, Day shared office space with

three other women in the Department's executive offices, where they each had their own office cubicle. Day described her work environment as "stressful" and that it was "extremely difficult to perform some of [her] functions" because the office was "extremely loud" and her coworkers were "out of control." Day recounted that in November 2007, the office noise was so excessive that she felt as if she was having a "panic attack." Day stated that she sought medical care for that particular incident but acknowledged that she neither filed a Department report documenting that event, nor mentioned it in her grievance.

Day stated that the purpose of constructing the daily log of her coworkers' activities was to document her work environment, which she reiterated consisted of yelling, hollering, and chatter. Day admitted that she recorded her coworkers without their knowledge but that (1) she did so because she wanted to determine whether the tape recorder would capture the office noise and (2) no one ever informed her that recording personal conversations was prohibited. Day estimated that she taped her coworkers for a few minutes and that the recorder was in plain view on her office desk.

Two coworkers who worked regularly with Day, the union steward, and several other employees who would routinely travel through the executive offices testified that they did not notice any excessive office noise. Day's coworkers further described

- 9 -

the executive office as a standard office environment, noting that the noise volume never rose to a level that interfered with their respective job performances.  Another Department supervisor who worked in another building testified that he would come to the Department's executive offices "when he needed to get away from the distractions."  The supervisor explained that the executive offices were "significantly" quieter than his work environment.

C. The Administrative Law Judge's Recommendation

In May 2009, the ALJ issued, in pertinent part, the following written recommendations:

"[T]he preponderance of the evidence indicates that on two different occasions (June 15, 2006 and March 18, 2008)[,] Day intentionally and secretly tape[-]recorded her co[]workers[] without their consent.  Day made the recordings intentionally and volun- tarily and she did so without permission and/or authorization from a superior.  *** Despite 15 years of service ***, positive performance evaluations, and no prior disci- plinary history, Day's violations of the eavesdropping statute not only offend basic notions of workplace decency[,] but [also]

- 10 -

fall precisely into the definition of a 'substantial shortcoming' rendering Day's continuance in her position 'detrimental to the discipline and efficiency of the service and which the law and sound public opinion recognize as good cause for the employee no longer holding the position.'  For these reasons, discharge is the appropriate discipline."

D. The Commission's Findings and Decision

Two weeks after the ALJ provided its recommendation, the Commission issued the following decision:

"The [Commission], having read the recommended decision of the [ALJ] ***, hereby amend[s] and adopt[s] said decision and [certifies] it to [CMS] for enforcement.

FINDING[S]:  It is hereby determined that the written charges for discharge approved by the director of [CMS] have been proven, but do not warrant discharge due to Day's 15 years of continuous service with no prior discipline.  Furthermore, there is no evidence that Day's action in tape recording her co-workers was premeditated or done with the requisite level of malicious intent.

- 11 -

        DECISION: The [Commission] recommend[s]

a 90-day suspension in lieu of discharge."

                E. The Circuit Court's Judgment

        In June 2009, the Department filed a complaint for

administrative review pursuant to section 3-108 of the Civil Code

(735 ILCS 5/3-108 (West 2008)), seeking to reinstate the ALJ's

discharge determination.  Following a November 2009 hearing, the

circuit court affirmed the Commission's decision to suspend Day

for 90 days in lieu of discharge.

        This appeal followed.

                II. THE COMMISSION'S DISCHARGE DECISION

                    A. The Standard of Review

        We first note that the appellate court's role is to

review the administrative conclusion, not the circuit court's

decision.  Metro Developers, LLC v. City of Chicago Department of

Revenue, 377 Ill. App. 3d 395, 397, 877 N.E.2d 785, 788 (2007).

"In discharge cases, '[t]he scope of review of an administrative

agency's decision regarding discharge is generally a two-step

process involving first, a manifest-weight standard, and second,

a determination of whether the findings of fact provide a suffi-

cient basis for the agency's conclusion that cause for discharge

does or does not exist.'"  Department of Human Services v.

Porter, 396 Ill. App. 3d 701, 718, 921 N.E.2d 367, 380 (2009),

quoting Brown v. Civil Service Comm'n, 133 Ill. App. 3d 35, 39,

                            - 12 -

478 N.E.2d 541, 544 (1985).

Initially, an administrative agency's findings and conclusions on questions of fact shall be held to be prima facie true and correct. 735 ILCS 5/3-110 (West 2006); American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board, State Panel, 216 Ill. 2d 569, 577, 839 N.E.2d 479, 485 (2005). In examining an administrative agency's factual findings, this court will not weigh the evidence or substitute its judgment for that of an administrative agency. City of Belvidere v. Illinois State Labor Relations Board, 181 Ill. 2d 191, 204, 692 N.E.2d 295, 302 (1998). Instead, this court is limited to ascertaining whether such findings of fact are against the manifest weight of the evidence. City of Belvidere, 181 Ill. 2d at 204, 692 N.E.2d at 302.

An administrative agency's discharge determination is subject to judicial review and "'will not be reversed unless it is arbitrary, unreasonable, or unrelated to the requirements of service.' [Citation.]" Porter, 396 Ill. App. 3d at 726, 921 N.E.2d at 386. A reviewing court may reverse a sanction imposed by an administrative agency when that agency, in opting for a particular sanction, acted unreasonably. Brown, 133 Ill. App. 3d at 39, 478 N.E.2d at 544.

B. The Department's Claim That the Commission's Decision
Was Arbitrary and Unreasonable

The Department argues that the Commission's conclusion

- 13 -

that cause to discharge Day did not exist was arbitrary and unreasonable. Specifically, the Department contends that the Commission's decision to reduce the ALJ's discharge recommendation to a 90-day suspension was "wholly conclusory" in that it provided "little analysis why it chose to reduce Day's discipline from discharge to a mere 90-day suspension." We disagree.

1. The Applicable Civil Service Commission Rule

Section 1.170 of Title 80 of the Administrative Code-- pertaining to cause for discharge--provides as follows:

"a) Cause for discharge consists of some substantial shortcoming which renders the employee's continuance in his position in some way detrimental to the discipline and efficiency of the service and which the law and sound public opinion recognize as good cause for the employee no longer holding the position.

b) In determining the appropriate penalty for an offense of which the employee is found guilty, the Commission shall consider the employee's performance record and the employee's length of continuous service unless the offense would warrant immediate discharge." 80 Ill. Adm. Code §1.170, as

- 14 -

amended by 19 Ill. Reg. 12451, 12464-65 (eff.
August 21, 1995).

### 2. The Basis of the Department's Contention That the Commission's Decisions Was "Wholly Conclusory"

In support of its contention that the Commission's suspension decision was "wholly conclusory" and, thus, arbitrary and unreasonable, the Department cites Austin v. Civil Service Comm'n, 247 Ill. App. 3d 399, 617 N.E.2d 349 (1993), and Bell v. Civil Service Comm'n, 161 Ill. App. 3d 644, 515 N.E.2d 248 (1987), for the proposition that when the Commission fails to (1) reject the ALJ's findings of fact or (2) make findings of fact inconsistent with those of the ALJ, its decision is arbitrary and unreasonable. However, under the facts of this case, Austin and Bell do not offer the Department any support. As we explain later, this case is distinguishable.

### a. The Bell Decision

In Bell, 161 Ill. App. 3d at 645, 515 N.E.2d at 249, an administrative agency sought to discharge Bell after an audit revealed that Bell, who was a real-estate investigator, credited time she spent on general administrative matters to specific real-estate cases. The evidence presented at a subsequent hearing showed that (1) the agency had recently implemented new time-reporting procedures, (2) Bell and other agency employees received training on the new reporting procedures, (3) Bell's supervisor (a) informed her that she should credit her adminis-

- 15 -

trative time to specific cases and (b) approved each of her time sheets, and (4) several other agency employees had difficulties with the new time-reporting procedures. Bell, 161 Ill. App. 3d at 646-47, 515 N.E.2d at 249-50. Based on this evidence, the hearing officer recommended (1) reversal of the agency's discharge decision and (2) that Bell receive a 30-day suspension. Bell, 161 Ill. App. 3d at 648, 515 N.E.2d at 250.

The Commission adopted the hearing officer's recommendation "'to the extent not inconsistent with their comments.'" Bell, 161 Ill. App. 3d at 648, 515 N.E.2d at 250. The Commission then stated that Bell's discharge was "'warranted because of the serious consequences of the failure to properly account.'" Bell, 161 Ill. App. 3d at 648, 515 N.E.2d at 250. After the circuit court affirmed the Commission's decision, Bell appealed. Bell, 161 Ill. App. 3d at 648, 515 N.E.2d at 251.

The First District Appellate Court reversed, concluding that the "Commission's findings were *** merely conclusory and insufficient" because it failed to "set forth specific findings of fact or conclusions of law in support of [its] decision not to follow the hearing officer's recommendation." Bell, 161 Ill. App. 3d at 649-50, 515 N.E.2d at 251-52.

b. The Austin Decision

In Austin, 247 Ill. App. 3d at 401, 617 N.E.2d at 351, DOC charged Austin, a corrections officer, with negligence and

- 16 -

improper handling of a contraband incident.  DOC suspended Austin pending discharge, which CMS later approved.  Austin, 247 Ill. App. 3d at 401-02, 617 N.E.2d at 351.  After Austin filed a request for a hearing, the hearing officer concluded that although Austin's initial actions were not negligent, he used poor judgment during the incident, which resulted in a dangerous situation.  Austin, 247 Ill. App. 3d at 402, 617 N.E.2d at 351.  The hearing officer (1) recommended Austin's suspension for 90 days in addition to the period of suspension DOC imposed pending his discharge and (2) found that Austin's actions did not warrant discharge.  Austin, 247 Ill. App. 3d at 402, 617 N.E.2d at 351.

As in Bell, the Commission adopted the hearing officer's decision "'to the extent not inconsistent with the comments set forth.'"  Austin, 247 Ill. App. 3d at 402, 617 N.E.2d at 351-52.  The Commission then rejected the hearing officer's "'analysis of the incident,'" finding that the "'seriousness of the incident,'" viewed in its totality, warranted Austin's discharge. Austin, 247 Ill. App. 3d at 403, 617 N.E.2d at 352.  On appeal, the circuit court reversed the Commission's sanction as too harsh and remanded for the determination of an appropriate penalty. Austin, 247 Ill. App. 3d at 403, 617 N.E.2d at 352.  On remand, the Commission ordered Austin suspended from duty for 90 days in addition to its original suspension-pending-discharge decision. Austin, 247 Ill. App. 3d at 403, 617 N.E.2d at 352.

- 17 -

On appeal from the circuit court's final order, the First District Appellate Court concluded that the Commission's initial discharge decision was conclusory and, thus, arbitrary and unreasonable because it failed to support its findings that the seriousness of the incident warranted Austin's discharge. Austin, 247 Ill. App. 3d at 404-05, 617 N.E.2d at 353. Specifically, the appellate court noted that "[a] reader of the commission's decision is left to divine which portion of the hearing officer's decision it found to be inconsistent with its conclusion." Austin, 247 Ill. App. 3d at 404, 617 N.E.2d at 353. The court also noted that the Commission neither rejected nor made any finding inconsistent with those of the hearing officer. Austin, 247 Ill. App. 3d at 404, 617 N.E.2d at 353.

### 3. The Commission's Decisions in This Case

We first note that as framed by the Department's argument, our review involves the Commission's determination to impose a 90-day suspension in lieu of discharge because the Commission determined that cause to discharge Day did not exist. The question before us is not whether this court would have imposed a harsher or more lenient penalty. Instead, the question before us is whether, in opting for a suspension in lieu of discharge--in contradiction to the ALJ's recommendation--the Commission substantiated its decision or whether its departure was arbitrary, unreasonable, or unrelated to the requirements of

- 18 -

service.

In this case, although the Commission's written decision (1) adopted the ALJ's decision and thus, by default, its findings of fact and (2) agreed with the ALJ that Day had violated the Department's standards of conduct by recording her co-workers, it also amended the ALJ's decision with regard to the appropriate penalty that should be imposed based on Day's actions and admissions. Specifically, the Commission disagreed with the ALJ's determination that Day's violation was a "substantial shortcoming," which was "detrimental to the discipline and efficiency" of the Department, requiring her immediate discharge for cause pursuant to section 1.170(a) of Title 80 of the Administrative Code. 80 Ill. Adm. Code §1.170(a), as amended by 19 Ill. Reg. 12451, 12464 (eff. August 21, 1995).

However, unlike Bell and Austin, the cases previously discussed and upon which the Department relied in support of its contention that the Commission's determination was "wholly conclusory," the Commission here explained why its decision that a 90-day suspension in lieu of discharge was the appropriate level of discipline by specifically placing greater emphasis than did the ALJ on Day's 15 years of service without any disciplinary infractions. See Davis v. City of Evanston, 257 Ill. App. 3d 549, 557, 629 N.E.2d 125, 131 (1993) (an employee's disciplinary records has a bearing on the issue of cause for discharge); see

- 19 -

also Brown, 133 Ill. App. 3d at 41, 478 N.E.2d at 546 (employment history has a bearing on the issue of cause for discharge).

We note that in opting for suspension in lieu of discharge, the Commission's consideration of Day's years of service and disciplinary record was (1) mandated by section 1.170(b) of Title 80 of the Administrative Code (80 Ill. Adm. Code §1.170(b), as amended by 19 Ill. Reg. 12451, 12465 (eff. August 21, 1995)) and (2) supported by the record. In addition, without reaching the merits of the propriety of its decision (because that issue is not before us), the Commission further explained its departure from the ALJ's recommendation by concluding that even though Day had violated the Department's standards of conduct when she recorded her coworkers' conversations--an issue neither party disputes--the evidence presented did not show that her conduct was "premeditated or done with the requisite level of malicious intent."

Therefore, because the Commission sufficiently substantiated its determination to depart from the ALJ's discharge recommendation, we reject the Department's contention that the Commission's decision was "wholly conclusory." Accordingly, we conclude that the Commission's determination to suspend Day in lieu of discharge was not arbitrary, unreasonable, or unrelated to the requirements of service.

### III. EPILOGUE

- 20 -

In closing, we note that since its creation in 1905, the Commission's role has changed from that of a central personnel agency responsible for examining and appointing applicants to state government positions to its self-proclaimed "watchdog" status, ensuring "that the employees and citizens of the State of Illinois are afforded the rights and protections set forth in the Personnel Code [(20 ILCS 415/1 through 25 (West 2008))]." http://www.icsc.il.gov/History.htm (visited October 14, 2010) (Illinois Civil Service Commission Web site). Given the constitutional and legal protections now available to all employees of this state, we question whether public policy is furthered by the Commission's continued expenditure of scarce state resources in cases like this one.

In Elrod v. Burns, 427 U.S. 347, 373, 49 L. Ed. 2d 547, 565, 96 S. Ct. 2673, 2689 (1976), and Branti v. Finkel, 445 U.S. 507, 519, 63 L. Ed. 2d 574, 584, 100 S Ct. 1287, 1295 (1980), the United States Supreme Court held that the first amendment to the United States Constitution (U.S. Const., amend. I) prohibits governmental officials from discharging public employees solely on the basis of political party affiliation. In Rutan v. Republican Party of Illinois, 497 U.S. 62, 79, 111 L. Ed. 2d 52, 69, 110 S. Ct. 2729, 2739 (1990), the Supreme Court extended its holding in Burns and Branti to "promotion, transfer, recall, and hiring decisions based on party affiliation."

Similarly, although Illinois courts have adhered to the proposition that an employer may discharge an at-will employee for any reason or for no reason, such an action is prohibited when the discharge violates various antidiscrimination laws. We note that none of these laws nor the aforementioned Supreme Court decisions attaching constitutional protections to employment decisions existed 105 years ago when the General Assembly created civil-service protections for state employees.

Here, we earlier concluded--based on our standard of review--that the Commission's determination to suspend Day in contravention of the ALJ's recommendation was not arbitrary or unreasonable. Nonetheless, we cannot imagine a private-sector employer continuing to employ Day based upon her misconduct, which the record before us makes abundantly clear. A private-sector employer would not tolerate the inevitably toxic office environment that her continued presence would create.

Although we note the Commission's valid responsibilities with regard to classification, merit, pay, and enforcement of its other personnel rules, perhaps the time has come for the General Assembly to reconsider whether the Commission should also duplicate the constitutional and statutory protections all state employees currently enjoy from being the victims of invidious discrimination, particularly when viewed in light of the costs imposed, as this case amply demonstrates.

## IV. CONCLUSION

For the reasons stated, we affirm the Commission's judgment.

Affirmed.

KNECHT and McCULLOUGH, JJ., concur.