NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250713-U

NO. 4-25-0713

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 18, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| MARY BLOOMBERG, as Administrator of the Estate of James Bloomberg, Deceased; and JAKE BLOOMBERG, | ) ) ) | Appeal from the Circuit Court of Warren County |
| Plaintiffs-Appellees, | ) | No. 21LM30 |
| v. | ) | |
| MICAH REIMER and PAMELA REIMER, | ) | Honorable |
| Defendants | ) | Kenneth J. Hogan, |
| (Michah Reimer, Defendant-Appellant). | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Presiding Justice Steigmann and Justice Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The trial court committed no error in finding plaintiff, Mary Bloomberg, as administrator of James Bloomberg's estate, did not make a judicial admission in probate proceedings that barred the estate's claim against defendant.

(2) The trial court committed no error in limiting defendant's cross-examination of a witness.

(3) The jury's verdict in favor of plaintiff, Mary Bloomberg, as administrator of James Bloomberg's estate, was not against the manifest weight of the evidence.

(4) Defendant failed to establish her entitlement to a judgment notwithstanding the verdict or a new trial with respect to her four counterclaims.

¶ 2    Plaintiffs—Mary Bloomberg, administrator of the estate of decedent James Bloomberg, and Jake Bloomberg—sued defendants, Micah Reimer and Pamela Reimer, for breach of contract, alleging they failed to fully pay for show cattle they purchased from James and Jake. (The record shows the trial court ultimately entered a directed verdict in Pamela's favor on the

basis that she owed no contractual obligation to plaintiffs, and she is not a party to this appeal.) Defendant brought counterclaims against Jake for breach of contract, defamation, assault, and interference with her contractual relations with others. The matter proceeded to a jury trial, and the jury returned verdicts in favor of plaintiffs and against defendant as to both plaintiffs' claims and defendant's counterclaims. Defendant appeals, arguing (1) the court erred in failing to find that Mary made a judicial admission that James's estate was owed no debt related to the underlying litigation, (2) the court erred in limiting her cross-examination of Mary at trial, (3) the jury's verdict in Mary's favor was against the manifest weight of the evidence, and (4) she is entitled to either a judgment notwithstanding the verdict (JNOV) or a new trial on each of her counterclaims. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        Jake and his father James owned and raised show cattle. In November 2021, they initiated the underlying breach of contract action against defendant. Plaintiffs' complaint alleged that in 2020, defendant agreed to purchase two "Simmental Heifers" and one "Angus Heifer" from them for a total of $65,000, to be paid in full by December 31, 2020. However, according to plaintiffs, defendant paid only $17,500 of the amount owed. They sought a judgment in their favor for the remaining amount, totaling $47,500.

¶ 5        In May 2022, James died. In June 2023, Mary, as administrator of James's estate, was substituted in his place as a party plaintiff. Plaintiffs thereafter twice amended their pleading, relying on essentially the same underlying facts as asserted in the original complaint.

¶ 6        In response, defendant denied plaintiffs' claims and filed counterclaims against Jake for (1) "Breach of Agreement to Provide Show Assistance," (2) "Interference with Contractual Relations," (3) "Assault/Harass[ ]ment/Intentional Infliction of Emotional Distress,"

and (4) "Defamation." Her claims were based on allegations that, to induce her to purchase three heifers instead of only one, Jake "agreed to provide fitting, trimming, grooming, and showing assistance work and personnel" to defendant. Defendant asserted that she had paid in full for one heifer, made down payments on the other two heifers, and took possession of all three. However, Jake failed to fulfill his part of the agreement and did not provide the promised services. Defendant also asserted that she attempted to show one or more of the heifers she purchased "at certain shows and presentations" in 2020, including the World Beef Expo. According to defendant, Jake "appeared and prohibited the showing of" the heifers. Defendant also alleged that Jake prohibited her showing of the heifers "by use of physically assaulting, intimidating, and stopping [her] and her show heifers." Additionally, she claimed that Jake told officials at the events, "in public and within hearing of multiple persons," that she " 'stole' " the heifers.

¶ 7        In March 2024, defendant filed a motion for partial summary judgment as to her defamation counterclaim against Jake. She maintained that Jake admitted during his deposition that he "committed defamation *per se*" and, as a result, she was entitled to a judgment on her counterclaim as a matter of law. In July 2024, the trial court denied defendant's motion.

¶ 8        In December 2024, defendant filed a second motion for partial summary judgment. Her second motion was directed at the claims Mary, as administrator of James's estate, raised against her. Defendant alleged that, through Mary, James's estate had "declared itself to have been fully satisfied as to any and all claims" that James had "for unpaid debts regarding the cattle that he owned." Specifically, she asserted that after James's death, Mary filed a sworn petition for probate in Warren County case No. 23-PR-14 and, in that petition, Mary "verified that there were no personal assets owed or owing to" James's estate, "other than a confidential lawsuit settlement." According to defendant, Mary's assertion in the verified pleading constituted a binding judicial

admission that James's estate was owed no debt related to defendant's purchase of show cattle from James. She alleged that as a result, James's estate had no further asset or debt to recover from her and that Mary, as the administrator of James's estate, should be dismissed as a party plaintiff from the underlying litigation.

¶ 9        Defendant attached the petition for probate from Warren County case No. 23-PR-14 to her filing. In the petition, dated May 31, 2023, Mary sought to be nominated as the personal representative of James's estate and set forth the following allegations regarding the estate's "[a]pproximate value":

"2. Approximate value of the Estate is:

a. Personal:            $-0-; and

b. Real Property:    $-0-

c. Lawsuit            $ Confidential under Non-Disclosure Agreement."

¶ 10       In response to defendant's motion, plaintiffs argued that judicial admissions are deliberate, clear, and unequivocal statements within a party's knowledge. They asserted that Mary's estimate in the probate petition of the estate's inventory was not an unequivocal statement that defendant owed no money.

¶ 11       On January 21, 2025, the trial court conducted a hearing on defendant's motion for partial summary judgment as to Mary's claims. The record contains no transcript of the hearing. However, the court made a docket entry, showing that the parties presented argument on the motion and that the court denied it "for the reasons stated on the record."

¶ 12       From January 27 to 29, 2025, the trial court conducted a jury trial in the matter. Evidence showed that Jake and his father James raised show cattle and were "partners" in that endeavor. They owned some cattle together but also "had different ownership and different cattle."

Jake also sometimes acted as a judge at cattle shows and first met defendant at a show he was judging in Wisconsin. In 2019, defendant purchased a heifer from Jake for $10,000.

¶ 13        In 2020, defendant contacted Jake to inquire about a heifer he had posted on social media. In July 2020, she visited plaintiffs' farm and, ultimately, agreed to purchase three heifers for a total of $65,000—an Angus heifer named "Bloom Spot" that Jake owned and two Simmental heifers named "In the Bank" and "Miss Bankroll" that James owned. The parties did not sign a written contract regarding the purchase of the three heifers.

¶ 14        According to Jake, defendant visited plaintiffs' farm on July 20, 2020, to see the heifer he posted on social media and other available cattle. During the visit, defendant agreed to purchase an Angus heifer that he owned named "Bloom Spot" for $15,000. She also expressed interest in a more expensive Simmental heifer ("In the Bank") that Jake had "priced" at $50,000. Because defendant did not have a trailer with her at the time of her visit, she indicated that she would return for the Angus heifer she had agreed to purchase. After leaving, defendant sent Jake text messages, inquiring about the Simmental heifer and requesting photographs and videos of the animal. Jake testified that the two continued to message one another and ultimately agreed that defendant would purchase the Angus heifer that Jake owned for $15,000 and two Simmental heifers that James owned for $50,000, for a total of $65,000. They discussed that defendant would make payments toward the purchase of the heifers. Jake stated that he wanted the heifers to be paid for by December 31, 2020, and defendant responded that she would need an "extra month or two."

¶ 15        Jake testified that on July 22, 2020, defendant returned to pick up the heifers and took possession of them. In August 2020, he also changed the "registration" for the heifers to defendant. He stated that when defendant picked up the heifers, she gave him three checks—one for $3,500, one for $5,000, and one for $15,000. They discussed that Jake would wait to cash the

checks to give defendant "some leeway to help her make payments." Jake testified that James cashed the $3,500 check and, around October 2020, he cashed the $5,000 check. Approximately a year later, Jake attempted to cash the $15,000 check but was told by his bank that "there was a stop payment on that" check.

¶ 16 In October 2020, Jake asked defendant through text messages about making additional payments for the heifers. He testified that defendant stated she would " 'get some payments,' " but he did not receive any. In November 2020, Jake sent defendant additional texts about payment for the heifers, reminding her that it was almost December and she still owed plaintiffs $56,000. Jake stated he also had a written contract prepared. In December 2020, he asked defendant to sign the contract and send it back to him. The record reflects that contract was never signed. Jake testified defendant started making small payments of $500 "at a time." In 2021, he continued to message her about making payments. From April through most of July 2021, defendant offered no response to his text messages. In late July 2021, she responded, stating that " 'We're trying,' " and, " 'We're doing the best we can.' " In August 2021, defendant, again, stopped responding to Jake's text messages. The various text messages between Jake and defendant from July 2020 through August 2021 were admitted into evidence.

¶ 17 Jake agreed that he received $10,000 from defendant for the purchase of his Angus heifer named "Bloom Spot." He testified that, in total, defendant paid $19,500 for the three heifers and that she still owed $45,500 toward her purchase. He identified copies of checks he received from defendant, and those copies were also admitted into evidence.

¶ 18 Regarding defendant's claim that he prevented her from showing cattle, Jake testified that he and James were selected as judges for the "junior show" at the September 2020 World Beef Expo. The night before, he learned that defendant had entered the heifers she

purchased from them in that show. Jake testified defendant could not exhibit cattle that he raised and sold in a show that he was judging. As a result, he texted defendant to inform her that she could not "show under [him] with cattle [he] raised/sold." According to Jake, defendant could have shown the heifers in the "open show" at the same event. Additionally, Jake denied that he stopped defendant from showing cattle at another show in 2020 in Kansas City, Missouri.

¶ 19    During his testimony, Jake also addressed defendant's claim that he had breached an agreement to provide her "show assistance." Jake testified that between July 2020 and August 2021, defendant never told him where she was showing cattle, except to say that she "wanted to enter [the heifers] for the World Beef Expo." Jake maintained, however, that defendant never talked to him about "coming [to that event] and doing anything to help her." He asserted that he did not have any way of knowing where defendant was showing the heifers. Jake recalled that before retrieving the heifers, defendant sent a text message asking him to find her a "good junior" to show the heifers. In response, he suggested "the Sullivans." However, Jake noted that he had no control over the Sullivans' business. He also denied "ever again" having a "discussion with [defendant] about a junior showing" the heifers that she purchased.

¶ 20    Jake agreed that in the past, he had "provided preparation for show animals to others." During defendant's second visit to look at the more expensive Simmental heifer, he told her that he could " 'help [her] get that preparation.' " He asserted, however, that he was unable to help defendant because she never "let [him] know what show she was going to."

¶ 21    Finally, Jake acknowledged having "a confrontation or altercation" with defendant at the 2021 World Beef Expo in the "makeup ring." He identified a photograph of himself and defendant at that show, which was admitted into evidence. Jake testified he and defendant were in a large open building with others around and that their interaction was "heated." He maintained

that during the interaction, he specifically stated to defendant, " 'If you weren't going to pay for [the cattle,] isn't that stealing?' " Jake maintained that he was angry but not loud during their conversation. He also denied that he "balled up [his] fists" or that he "got within four to six inches of [defendant's] face." Jake estimated that he remained a foot away from defendant while speaking to her.

¶ 22    Jake called Eric Lee as a witness to testify regarding the events at the 2021 World Beef Expo. Lee testified that he owned a livestock marketing firm. He knew defendant and stated that in 2020, he sold her a heifer. In 2021, he was present at the World Bee Expo and "was fitting a heifer" that he had sold to defendant. He was present in the "makeup ring" when Jake and defendant had their conversation. Lee estimated that he was approximately 8 to 10 feet away from Jake and defendant and that he was the closest person to them. He did not hear what Jake and defendant were discussing and denied seeing Jake raise his fists or become aggressive toward defendant. Lee testified that it also did not appear that Jake and defendant were arguing and, instead, asserted that they appeared to be having "a normal conversation." He did not find anything unusual about the interaction.

¶ 23    On cross-examination by defendant's counsel, Lee agreed that he and Jake were friends and that in the past, they had done business together. He stated he was standing next to defendant at the World Beef Expo and when Jake approached defendant to have a discussion, he turned his back and walked several steps away. Lee asserted, however, that he "was always in eye view" of Jake and defendant and indicated that he only had his back turned "[f]or a matter of maybe a second." He denied ever seeing Jake "ball up his fists" or encroach on defendant's personal space.

¶ 24    Mary testified that she worked as a registered nurse and was James's wife. Her

family farmed, and James and Jake managed a cattle operation. Mary knew James sold cattle but had no direct involvement with his and Jake's business dealings or with the details of their transactions. She did not know any of the details of the July 2020 deal that involved defendant.

¶ 25    Mary stated that while the underlying case was pending, James "was killed tragically." She recalled signing a petition for probate that stated the approximate value of James's estate. Mary identified a copy of the petition, and it was admitted into evidence. She testified that, at that time she signed the petition, she had no knowledge of the value of the underlying lawsuit involving defendant, the price of the heifers that were sold or what amounts were paid, or what James's estate could receive from a favorable jury verdict.

¶ 26    On cross-examination, Mary acknowledged that she listed a confidential lawsuit in the probate petition when setting forth everything James's estate owned or had rights to. She indicated that the confidential lawsuit was "settled before" her filing of the probate petition. When asked to clarify that the confidential lawsuit was not the same as the underlying suit involving "any claim for heifers," Mary responded that she "was unaware of" the underlying lawsuit. She also confirmed that the confidential lawsuit was the only one referenced in the probate petition. Defendant's counsel attempted to further question Mary to confirm that the confidential suit was "not this lawsuit" and, in doing so, twice attempted to reference the name of a party in the confidential suit. Both times, plaintiffs' counsel objected. After the trial court indicated it did not think it was "necessary to go into the details of [the confidential] lawsuit," defendant's counsel stated, "I don't want to other than it's not this lawsuit." Ultimately, the court found defendant's counsel could ask Mary whether the probate petition referred to the underlying lawsuit, and the following colloquy occurred:

"BY MR. FLEMING [(DEFENDANT'S COUNSEL)]:

Q. This affidavit does not list the lawsuit for claim for cost for heifers [*sic*], true?

A. I can't list something if I'm not aware of it.

THE COURT: I'm going to ask you to answer the question.

[MARY]: Yes.

* * *

THE COURT: And let's be clear. So the answer to the question is the lawsuit that is listed in the Petition for Probate is not this lawsuit, correct?

[MARY]: Correct."

On questioning by defendant's counsel, Mary further confirmed that she did not list the underlying lawsuit as an asset in the probate petition.

¶ 27    Following defendant's questioning, the trial court stated it would grant plaintiffs' motion to strike references to any party in the confidential lawsuit and stated as follows:

"I don't think [references to a party's name in the confidential lawsuit is] terribly prejudicial here, but I understand too that I don't think it's necessarily relevant to what [defendant's counsel] was trying to bring out in any event, so I'm just striking that reference and asking the jury to just disregard any details as to that other lawsuit, but the testimony concerning whether or not that reference [in the probate petition] referred to this lawsuit, of course, did come in and is admissible evidence."

The record reflects that following its comments, the court asked Mary if she needed "a moment to compose" herself, and she responded, "I'm fine." Mary also declined the court's offer of a Kleenex, stating, "I don't need a [K]leenex, thank you." On redirect examination, Mary reiterated that when she signed the probate petition, she was unaware of the underlying "heifer lawsuit."

- 10 -

¶ 28 Defendant testified as a witness both in plaintiffs' case and in support of her own counterclaims. She stated she had several occupations, including running a cattle business. Defendant confirmed that in July 2020, she agreed to purchase three heifers from plaintiffs for $65,000. She recalled that upon her initial visit to plaintiffs' farm, she agreed to purchase an Angus heifer from Jake for $15,000. Then, during her second visit on July 22, 2020, they had discussions about two more heifers. Jake promised that if defendant purchased the more expensive Simmental heifer, he would have Sarah Sullivan, who defendant indicated was a well-known "junior" in the show cattle industry, "campaign that heifer for [defendant]" and that he would "provide fitting and clipping services for all the big shows." Defendant stated that Jake represented that he was "extremely good friends" with the Sullivan family.

¶ 29 Defendant testified that when purchasing the three heifers, she agreed to pay $15,000 for the Angus heifer named "Bloom Spot" and $3,500 for the less expensive Simmental heifer named "Miss Bankroll." Defendant maintained the more expensive Simmental heifer named "In the Bank" was $46,500. She testified that she wrote a check to James for $3,500 for the less expensive Simmental heifer and that the check was cashed.

¶ 30 Defendant also maintained that when she picked up the three heifers on July 22, 2020, Jake said he would give her "as much time as [she] needed" to pay for the heifers in full and that she "never had a set time" in which she had to pay. Although defendant acknowledged that the parties' text messages did not reflect that agreement, she asserted that, later, the "conversation changed." Defendant testified she paid $19,500 toward her purchase of the heifers and that at the end of 2021, she stopped making payments. She further testified that she stopped payment on the $15,000 check she had given Jake in July 2020 but asserted that she sent him a "replacement check" of $500.

¶ 31    Defendant acknowledged that Jake sent her text messages asking for payments and that many times, she did not respond to his texts. She explained that their "relationship and friendship changed" following a show in October 2020 in Kansas City when Jake "failed to follow through on his promises" of having someone "campaigning" the more expensive Simmental heifer that she had purchased from plaintiffs. Specifically, defendant testified as follows:

> "[Jake] sold the package of those heifers at that price due to the promise to fulfill Sarah Sullivan or a junior with a good reputation that would get that heifer to the next level making her more profitable for my business and getting me to the next level."

According to defendant, Jake "ghosted" her at the Kansas City show, stopped her from showing the heifers she purchased, and "didn't follow through with his promises *** of having Sarah Sullivan campaign [the expensive] heifer" or bringing Sullivan to defendant's stall at the show. She testified Sullivan never showed her heifer and Jake never provided her with any fitting, clipping, trimming, or show presentation services.

¶ 32    Defendant acknowledged that after their second meeting on July 22, 2020, she had no further discussions with Jake about his "showing assistance" promises. She also agreed that she never communicated to Jake that she felt he had failed to follow through with his promises. Defendant testified that in her text messages, she never told Jake that she was going to any specific show or asked for his help. She also did not call him to talk about any of the shows. Although defendant suggested that she "could have" had conversations with Jake through Snapchat where "the snapped message disappears after a certain time," she ultimately did not remember whether she "talked to him" on that platform. She also agreed that she never messaged Jake to ask him to help her at a show.

¶ 33    Defendant testified that Jake prohibited her from showing the heifers "to anybody" at the 2020 World Beef Expo in Milwaukee, Wisconsin. She stated he did that by sending her a text message after she was already "checked in" at the show. Defendant maintained that she did not understand why she could not show the heifers she purchased in the "junior show" at the 2020 World Beef Expo. She testified that she had bought cattle from other livestock judges in the industry and asserted that Jake "said there was no problem ever buying an animal from him and showing underneath him [and] that he would judge the calf fairly." Defendant agreed that in text messages, she told Jake she was not mad that she could not show the heifers she purchased from him and that she would try to "substitute them for different animals." She also acknowledged that she could have shown the heifers in the "open show" at the same event.

¶ 34    Defendant further testified that Jake "assaulted or had [an] altercation with" her at the 2021 World Beef Expo. According to defendant, Jake approached her as she was "on deck" and "about to go into the ring." She described their location as a large arena with spectators, judges, and other people around. Defendant testified Jake told her that they needed " 'to get settled up' " and stated as follows: " 'You think you can get away with stealing cattle and not pay for them? I mean, come on. You stole them.' " She asserted that Jake "got really heated and really in [her] face." She observed that his fists were "clenched" and stated she "flinched," thinking that Jake was going to hit her. Defendant also described Jake as being "aggressive" and "loud." She identified a photograph that her mother took of the incident. Additionally, she testified that after the incident, she filed for an order of protection against Jake in Wisconsin.

¶ 35    Pamela also testified regarding the interaction between Jake and defendant at the 2021 World Beef Expo and stated she was the one who took the photograph of the incident. Pamela estimated that she was 15 to 20 feet away from Jake and defendant and stated that she could hear

what they were saying. She observed Jake get "pretty close" to defendant toward the end of their conversation and asserted he was "very aggressive." Pamela testified she saw Jake "doubled his fists up" and heard him say " 'What the "F" is that supposed to mean?' " Pamela also heard Jake say that defendant " 'stole.' " She testified that Lee, who had been standing by defendant, "took off as soon as Jake walked over."

¶ 36        In rebuttal to defendant's and Pamela's testimony, Jake testified Lee was present during his interaction with defendant at the 2021 World Beef Expo. Additionally, he denied that he and defendant ever discussed Sullivan visiting defendant's "stall" at the Kansas City show.

¶ 37        Following the parties' presentation of evidence, defendant moved for a directed verdict in her favor against James's estate, again arguing that Mary judicially admitted that James's estate had no claim against her. She also moved for a directed verdict as to her defamation counterclaim. The trial court denied both motions, finding, with respect to defendant's judicial admission claim, that Mary had not made an "unequivocal admission" in the probate petition. Ultimately, the jury returned verdicts in favor of plaintiffs and against defendant as to all claims and counterclaims. As to plaintiffs' claims, the jury awarded Mary, as administrator of James's estate, damages of $43,000 and Jake damages of $10,000. In February 2025, the court entered judgment on the jury's verdict.

¶ 38        In March 2025, defendant filed a posttrial motion for a new trial or a JNOV. She challenged the jury's monetary awards, arguing they were not supported by the evidence and that she was entitled to a remittitur or a new trial on damages. Defendant also argued that (1) Mary's statements in the probate petition constituted a judicial admission that, along with the other evidence at trial, established she did not owe any amount to the estate, (2) the evidence overwhelmingly favored her as to her counterclaims against Jake for defamation and "Failure to

Provide Show Assistance," (3) the trial court abused its discretion by barring her from cross-examining Mary "about the verified factual statements she made in" the probate petition, and (4) the jury's verdicts with respect to plaintiffs' claims and her counterclaims for assault and defamation were against the manifest weight of the evidence.

¶ 39 In May 2025, the trial court conducted a hearing on defendant's posttrial motion. The record contains no transcript of the hearing; however, the court's docket entry reflects that it denied defendant all relief, other than for her challenge to the jury's monetary awards. The court stated it would grant a new trial on damages unless plaintiffs accepted reduced judgments of $40,500 for James's estate and $5,000 for Jake. In June 2025, the court entered a written order on defendant's posttrial motion consistent with its docket entry and reflecting that plaintiffs had agreed to the reduced awards. The same month, the court entered modified judgment orders, setting forth the reduced monetary awards to plaintiffs.

¶ 40 This appeal followed.

¶ 41                                II. ANALYSIS

¶ 42                        A. Mary's Alleged Judicial Admission

¶ 43 On appeal, defendant first argues that Mary's sworn statements in the Warren County probate petition regarding the value of James's estate constituted a binding judicial admission that the estate was owed no debt related to the sale of cattle and barred the estate's claim in the underlying litigation. She contends the trial court erred by denying her second motion for partial summary judgment, which raised that issue, and asserts that Mary, as administrator of James's estate, should have been dismissed as a party plaintiff. Alternatively, defendant contends the court should have granted her a directed verdict or a JNOV as to Mary's claim against her based on the alleged binding judicial admission in the probate petition.

¶ 44    Initially, although not addressed by the parties, we find the trial court's denial of defendant's motion for partial summary judgment is not reviewable. "Ordinarily, the denial of summary judgment is not appealable, because such an order is interlocutory in nature." *Clark v. Children's Memorial Hospital*, 2011 IL 108656, ¶ 119. "[W]hen a motion for summary judgment is denied and the case proceeds to trial, the order denying the motion for summary judgment merges with the judgment entered and is not appealable." (Internal quotation marks omitted.) *Larsen v. Carle Foundation*, 386 Ill. App. 3d 799, 802 (2008). In *Clark*, our supreme court noted two exceptions to this general rule, stating as follows:

> "[W]e have recognized an exception [to the rule that the denial of summary judgment is not appealable,] as when the parties have filed cross-motions for summary judgment and one party's motion is granted and the other party's denied. Because the order disposes of all issues in the case, review of the denial of summary judgment may be had. [Citation.] Our appellate court has similarly concluded that the propriety of the denial may be considered if the case is properly before a reviewing court from a final judgment and no trial or hearing has been conducted." *Clark*, 2011 IL 108565, ¶ 119.

¶ 45    Here, neither of the exceptions recognized in *Clark* apply. The parties did not file cross-motions for summary judgment and the matter was resolved through a jury trial. Accordingly, the general rule applies and the trial court's denial of defendant's motion for partial summary judgment is not appealable.

¶ 46    Nevertheless, as noted, defendant also raises the alternative argument that she was entitled to a directed verdict or JNOV based on the same judicial-admission claim. The record shows that following the parties' presentation of evidence at trial, defendant moved for a directed

verdict, arguing that Mary judicially admitted that James's estate had no claim against her. She raised the same contention in her posttrial motion and sought a JNOV. Thus, defendant's judicial-admission claim is properly reviewable in the context of the trial court's denial of her motion for a directed verdict and her posttrial motion for a JNOV, and we consider the merits of her claim.

¶ 47          Motions for a directed verdict and JNOV are made at different times, but both "raise the same questions and are governed by the same rules of law." *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 37. Such motions "should be granted only when all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [a] movant that no contrary verdict based on that evidence could ever stand." (Internal quotation marks omitted.) *Id.* The standard for entering a directed verdict or JNOV "is a high one" and "not appropriate if reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented." (Internal quotation marks omitted.) *Id.* Additionally, the trial court's rulings as to both motions are subject to *de novo* review. *Id.*

¶ 48          Notably, this court has also applied a *de novo* standard of review to the question of whether a party's statement constituted a judicial admission. *Hall v. Cipolla*, 2018 IL App (4th) 170664, ¶ 102. In *Hall*, we noted a split of authority regarding the standard of review for such questions, with some appellate courts applying an abuse-of-discretion standard and others, including the Fourth District, applying a *de novo* standard. *Id.* ¶ 101 (collecting cases). Ultimately, we inferred from supreme court authority that the *de novo* standard was the appropriate standard and elected to follow our own prior decisions in applying that standard. *Id.* ¶ 102; see *Herman v. Power Maintenance & Constructors, LLC*, 388 Ill. App. 3d 352, 360 (2009) ("Whether an admission is a judicial admission or an evidentiary admission is a question of law, which we decide

- 17 -

*de novo*."); see also *Caponi v. Larry's 66*, 236 Ill. App. 3d 660, 671 (1992) ("The determination of whether a party's statement is sufficiently unequivocal to be considered a judicial admission is a question of law."); but see *In re Marriage of Hundley*, 2019 IL App (4th) 180380, ¶ 118 ("A trial court's treatment of a judicial admission is reviewed for an abuse of discretion."). In this instance, we adhere to our decision in *Hall* and consider *de novo* whether the trial court erred in failing to find that Mary's challenged statements in the probate petition constituted a binding judicial admission in the present case that entitled defendant to a judgment in her favor against Mary, as administrator of James's estate.

¶ 49        "An admission by a party is substantive evidence admissible as an exception to the rule excluding hearsay." *In re Estate of Rennick*, 181 Ill. 2d 395, 406 (1998). "Ordinary evidentiary admissions may be contradicted or explained." *Id.* They are distinguishable "from judicial admissions, which conclusively bind a party." *Id.* "Judicial admissions are defined as deliberate, clear, unequivocal statements by a party about a concrete fact within that party's knowledge." *Id.* This court has further described judicial admissions as follows:

> "Judicial admissions have the effect of withdrawing a fact from issue and cannot be contradicted at trial. [Citation.] As a result, [t]he doctrine of judicial admissions requires thoughtful study for its application so that justice not be done on the strength of a chance statement made by a nervous party. [Citation.] Judicial admissions cannot be matter[s] of opinion, estimate, appearance, inference, or uncertain summary. [Citation.] Whether a statement is a judicial admission must be determined under the circumstances of each case, and each statement must be given meaning consistent with the context in which it was found." (Internal quotation marks omitted.) *Hundley*, 2019 IL App (4th) 180380, ¶ 118.

¶ 50 "Judicial admissions *** include admissions in pleadings *which form the basis of the action*." (Emphasis added.) *Goodwin v. ITT Commercial Finance Corp.*, 146 Ill. App. 3d 810, 813-14 (1986). Significantly, however, "[v]erified statements in pleadings from one case, *** when used in another case, are ordinary evidentiary admissions which are not binding upon the party who made them." *Id.* at 814. "Such statements may be admitted in a later action as statements against interest, but they may be controverted or explained." *Id.*; *In re Marriage of O'Brien*, 247 Ill. App. 3d 745, 749 (1993) (same).

¶ 51 Here, defendant sought to have Mary's statements in the probate petition regarding the value of James's estate conclusively bind the estate in the present action. However, the probate petition was a pleading filed in a different case—Warren County case No. 23-PR-14—made before Mary was a party to the underlying litigation. As set forth above, only admissions in pleadings that form the basis for a cause of action may be considered as a judicial admission in that cause of action. A party's admission from a different case constitutes only an ordinary evidentiary admission. Thus, Mary's statements in the Warren County probate petition were at most evidentiary admissions, which were not conclusive and could be contradicted or explained.

¶ 52 Additionally, even assuming Mary's statement in a verified pleading in a different case could constitute a judicial admission in the underlying action, the statement at issue fell short of being a "deliberate, clear, unequivocal statement[ ] by a party about a concrete fact within that party's knowledge." *Rennick*, 181 Ill. 2d at 406. Specifically, in the probate petition, Mary provided only an estimate or "[a]pproximate value" of James's estate. Additionally, although the underlying action was pending when Mary signed the probate petition in May 2023, she was not yet a party plaintiff in this case. Mary also denied knowledge of the underlying lawsuit or its possible value, and the record fails to reflect that she had any personal involvement in defendant's

purchase of the heifers from James and Jake.

¶ 53　　　　Given the circumstances presented, the trial court committed no error in finding that Mary's statements in the Warren County probate petition did not constitute a binding judicial admission that barred the estate's claims against defendant in this case. It also committed no error in denying defendant's motions for a directed verdict or JNOV on the basis that Mary judicially admitted that James's estate was owed no debt.

¶ 54　　　　　　　　　　　B. Defendant's Cross-Examination of Mary

¶ 55　　　　On appeal, defendant next argues the trial court abused its discretion by "severely" restricting her cross-examination of Mary at trial. She contends the court barred her from questioning Mary "regarding [the] identification of all pending claims and lawsuits held by [James's estate], and the reasons or motivations why [Mary] may not have disclosed the present lawsuit" in the Warren County probate petition. Defendant also complains that the court prevented her from making "a comparison between the damages claims involved in the present cattle transaction [and Mary's] claims in the 'confidential' lawsuit." Further, she asserts that Mary "reacted emotionally" to the court's ruling limiting her cross-examination, which she suggests "may have prejudiced the Defendant in the eyes of the jury." Defendant argues that she is entitled to a new trial due to the court's error.

¶ 56　　　　"The scope of cross-examination rests within the discretion of the trial court and will not be disturbed on review absent a clear abuse of that discretion resulting in manifest prejudice to the party claiming error." *McDonnell v. McPartlin*, 192 Ill. 2d 505, 533 (2000). "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court." *Seymour v. Collins*, 2015 IL 118432, ¶ 41.

¶ 57    Here, the record does not support defendant's contention that the trial court "severely" restricted her cross-examination of Mary. At trial, Mary testified regarding her statements in the Warren County probate petition. In the petition, Mary listed a confidential lawsuit when setting for the approximate value of James's estate. Defendant's counsel cross-examined Mary regarding her statements in the probate petition and, during his questioning, twice attempted to state the name of a party to the confidential lawsuit. Plaintiffs' counsel objected, and the trial court responded by indicating that the details of the confidential lawsuit were not relevant. Defendant's counsel represented to the court that he only wanted to elicit testimony from Mary that the two lawsuits were not the same, and the court allowed counsel to pose further questions on that subject. Eventually, Mary testified that the lawsuit listed in the probate petition was not the underlying lawsuit and further clarified that she did not list the underlying lawsuit as an asset in the probate petition. Following Mary's testimony, the court stated it would strike references to party names from the confidential lawsuit and directed the jury to disregard such details.

¶ 58    The record shows defendant was not prohibited from cross-examining Mary regarding any subject except for the specific details of the confidential lawsuit. Significantly, defense counsel's comments to the trial court reflected no disagreement with the court's ruling when it was made. Rather, counsel indicated to the court that he did not intend to delve into the details of the confidential lawsuit and that he only wanted to establish that the underlying lawsuit was not referenced in the probate petition. Counsel was permitted to further question Mary on that point and elicited the desired testimony. To the extent defendant now challenges the court's ruling on review, she fails to explain the relevancy of the details of the confidential lawsuit to the underlying litigation. Ultimately, the court's ruling limiting testimony about the details of the confidential lawsuit was not arbitrary, fanciful, or unreasonable, and the record reflects no abuse

of its discretion.

¶ 59 As noted, defendant also suggests she may have been prejudiced by Mary's emotional reaction to the trial court's ruling and argues that "where the court improperly excludes potentially relevant evidence, to the prejudice of a party, a new trial is warranted." See *Pister v. Matrix Service Industrial Contractors, Inc.*, 2013 IL App (4th) 120781, ¶ 56 ("An error in the admission or exclusion of evidence will not constitute reversible error unless one party has been prejudiced or the proceedings have been materially affected."). However, as set forth above, neither the record nor defendant's arguments on appeal support the finding that the court improperly excluded relevant evidence. Additionally, the record also fails to reflect that Mary's alleged emotional reaction was significant or that it disrupted the proceedings. The record shows that following its ruling, the court asked Mary if she needed a moment to compose herself, and Mary responded that she was "fine." She also declined the court's offer of a Kleenex. No further comment was made by either the court or any party, and the proceedings continued without interruption. Defendant's assertions of prejudice are entirely speculative.

¶ 60 C. The Jury's Verdict in Favor of Mary,

as Administrator of James's Estate

¶ 61 Defendant further argues that the jury's verdict in favor of Mary, as administrator of James's estate, was against the manifest weight of the evidence. Specifically, she contends that Jake admitted that he agreed to provide her with "show assistance" to influence her to purchase the more expensive Simmental heifer named "In the Bank." Defendant also asserts that both Jake's testimony and her own testimony showed that Jake "breached that term" by never providing such assistance.

¶ 62 Initially, we note that defendant has not presented a fully developed argument as to

- 22 -

this issue by failing to include within her brief the necessary legal authority to support her claim. Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires that an appellant's argument "contain the contentions of the appellant and the reasons therefor, *with citation of the authorities and the pages of the record relied on.*" (Emphasis added.) Failing to support an argument on appeal with citation to authorities results in forfeiture of that issue. *Illinois Department of Human Services v. Porter*, 396 Ill. App. 3d 701, 719 (2009).

¶ 63 Here, defendant cites no legal authority in the portion of her brief that sets forth her argument that the jury's verdict in Mary's favor was against the manifest weight of the evidence. Although elsewhere in her brief she cites authority for the principle that a new trial may be granted where the verdict is against the manifest weight of the evidence, she never identifies the relevant contract principles upon which her claim is based. Accordingly, we find the issue forfeited.

¶ 64 Further, even setting aside defendant's forfeiture, her claim lacks merit. "On a motion for new trial, the court, after considering the evidence, will set aside the jury's verdict and order a new trial if the verdict is contrary to the manifest weight of the evidence." *Steed v. Rezin Orthopedics & Sports Medicine, S.C.*, 2021 IL 125150, ¶ 44. "A verdict is contrary to the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary[,] and not based upon any of the evidence." (Internal quotation marks omitted.) *Id.* A court's ruling on a motion for a new trial will not be reversed "unless it is affirmatively shown that the trial court clearly abused its discretion." (Internal quotation marks omitted.) *Id.*

¶ 65 "Generally, to recover on a breach of contract claim, the party must have performed its part of the contract" because substantial performance is a necessary element to such a claim. *PML Development LLC v. Village of Hawthorn Woods*, 2023 IL 128770, ¶ 50. Additionally, "[t]he

first-to-breach rule excuses a party's duty to perform under the contract if the other party materially breaches the agreement first." *Id.* "In other words, the first-to-breach rule excuses the injured party from future performance and allows the injured party to pursue its breach of contract claims. Conversely, the first breaching party cannot seek to enforce the contract against the injured party." *Id.*

¶ 66 "The test of whether a breach is material is whether it is so substantial and fundamental as to defeat the objects of the parties in making the agreement or whether the failure to perform renders performance of the rest of the contract different in substance from the original agreement." *Slyce Coal Fired Pizza Co. v. Metropolitan Square Plaza, LLC*, 2025 IL App (1st) 221279, ¶ 139. "The breach must be so material and important to justify the injured party in regarding the whole transaction at an end." (Internal quotation marks omitted.). *Id.*

¶ 67 At trial, defendant argued plaintiffs could not establish their breach of contract claims due to Jake's failure to fulfill his promises under the parties' agreement to provide "show assistance" in the form of a "junior" to show the heifers she purchased and other show preparation, including "fitting" and "clipping" services. Although defendant testified at trial that these promises were part of the parties' agreement, as plaintiffs argue on appeal, there was sufficient other evidence from which the jury could have concluded that a promise to provide "show assistance" was not a material term of the parties' contract.

¶ 68 First, defendant testified that Jake made promises about show assistance at their July 22, 2020, meeting when she visited plaintiffs' farm for the second time. According to defendant, Jake's promises included assertions that Sullivan, a well-known "junior" in the cattle industry, would visit her stall at a show in Kansas City and "campaign" one of the heifers. However, Jake denied defendant's claims regarding Sullivan and testified that he had no control

over the Sullivans or their business operations.

¶ 69    Second, although the record shows Jake acknowledged that he told defendant on July 22, 2020, that he could help her get show "preparation," testimony from both Jake and defendant also established that they never had any further communications about the topic. Specifically, Jake testified that he could not have helped defendant with show preparation because he "didn't know what show she was going to." In turn, defendant acknowledged that after July 22, 2020, she had no communications with Jake about "showing assistance," never told Jake she was going to any specific shows, and never asked Jake for his help. She also agreed that she never communicated with Jake regarding her claim that he had failed to follow through with any promises. This is true despite Jake's repeated communications with defendant regarding her failure to make payments toward the heifers. Such evidence suggests a promise to provide show assistance was not an important or fundamental part of the parties' agreement for defendant's purchase of the heifers.

¶ 70    Given the evidence presented, an opposite conclusion from the one reached by the jury was not clearly evident. Thus, even absent defendant's forfeiture, we would find the jury's verdict was supported by the record and not against the manifest weight of the evidence, and defendant is not entitled to a new trial.

¶ 71    D. Defendant's Counterclaims Against Jake

¶ 72    1. *Defamation*

¶ 73    On appeal, defendant further argues that Jake, by his own admission at trial, committed defamation *per se* by stating, in "a crowded show arena with many spectators present," that she " 'stole' " the heifers. Defendant suggests the trial court erred in failing to grant her motion for partial summary judgment as to this issue. She also argues that she is entitled to a JNOV on

this issue, along with a trial on damages.

¶ 74    Generally, to establish a claim for defamation, a plaintiff must show "that (1) the defendant made a false statement about the plaintiff, (2) the defendant made an unprivileged publication of that statement to a third party, and (3) the publication caused damages." *Project44, Inc. v. FourKites, Inc.*, 2024 IL 129227, ¶ 20. Additionally, in Illinois, "there are five categories of statements that are considered defamatory *per se*, including *** statements that impute a person has committed a crime." *Id.* "A statement is defamatory *per se* if its harm is obvious and apparent on its face." *Id.* "If a defamatory statement is actionable *per se*, the plaintiff need not plead or prove actual damages to recover." *Id.*

¶ 75    "The word 'publication' is a term of art referring to the intentional or negligent communication of the allegedly defamatory statement to a third party, that is, a person other than the person who is allegedly defamed." *Id.* ¶ 21. "Publication of a defamatory statement to the plaintiff alone is insufficient to state a cause of action for defamation." *Id.*

¶ 76    Initially, as defendant points out, she sought partial summary judgment as to her defamation claim, and the trial court denied her motion. For the same reasons already discussed, to the extent she challenges that denial on appeal, her claim is not reviewable because it merged with the judgment entered after the jury trial. See *Clark*, 2011 IL 108656, ¶ 119; *Larsen*, 386 Ill. App. 3d at 802.

¶ 77    Again, however, defendant also filed a posttrial motion arguing she was entitled to a JNOV as to her defamation claim. Accordingly, we may review the merits of her claim in the context of the trial court's denial of her posttrial motion for a JNOV. As set forth above, a motion for a JNOV "should be granted only when all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [a] movant that no contrary verdict based on

that evidence could ever stand." (Internal quotation marks omitted.) *Lawlor*, 2012 IL 112530, ¶ 37. The standard for entering a JNOV "is a high one" and "not appropriate if reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented." (Internal quotation marks omitted.) *Id.*

¶ 78 Further, "[i]n ruling on a motion for a JNOV, the trial court does not weigh the evidence or determine the credibility of the witnesses." *Hassard v. DS Retail, LLC*, 2023 IL App (4th) 220687, ¶ 31. "Rather, the court considers only the evidence and any inferences therefrom in the light most favorable to the opponent of the motion." *Id.* "The court has no right to enter a [JNOV] if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992). The trial court's ruling on a motion for a JNOV is reviewed *de novo*. *Hassard*, 2023 IL App (4th) 220687, ¶ 31.

¶ 79 At trial, evidence showed Jake approached defendant in a "makeup ring" in a large open building with others present. Jake acknowledged that their interaction was heated but denied being loud. He asserted that he stated to defendant, " 'If you weren't going to pay for [the cattle,] isn't that stealing?' " Jake also presented testimony from Lee, who asserted that he had been standing next to defendant when Jake approached. Lee estimated that he stood 8 to 10 feet from them as they spoke and stated that he was the closest person to them. Lee did not hear what Jake and defendant were discussing and asserted that they appeared to be having a normal conversation. A photograph of the encounter was entered into evidence. The photograph showed numerous spectators sitting in an arena behind defendant and Jake. As asserted by plaintiffs on appeal, defendant and Jake's interaction did not appear to draw the attention of the crowd.

¶ 80 Defendant presented conflicting evidence regarding the encounter. She testified that Jake stated that she " 'stole' " the cattle and that he was loud and aggressive. Pamela testified on defendant's behalf that she stood 15 to 20 feet away from Jake and defendant and that she heard Jake say that defendant " 'stole.' "

¶ 81 Ultimately, the credibility of witnesses and the resolution of conflicts in the evidence was for the jury to resolve as the trier of fact. Evidence at trial supports a finding that Jake questioned defendant regarding their agreement and her alleged failure to pay for the heifers and that the conversation was not "published" to any third party. Although defendant presented conflicting evidence, the jury was not required to accept her version of the events. The jury clearly accepted Jake's and Lee's testimony, and the record does not overwhelmingly favor a different result. Thus, the trial court committed no error in denying defendant's motion for a JNOV as to her defamation counterclaim.

¶ 82                    2. *Failure to Provide Show Assistance*

¶ 83 On appeal, defendant further argues that she is entitled to a JNOV on her counterclaim alleging Jake breached the parties' agreement by failing to provide show assistance. However, despite asserting her entitlement to a JNOV, she cites propositions of law that pertain solely to a motion for a new trial.

¶ 84 Notably, the standards for granting a new trial and a JNOV are different. *Maple*, 151 Ill. 2d at 453-54. As discussed, a new trial may be granted where a court finds the jury's verdict is contrary to the manifest weight of the evidence. *Id.* at 454. Conversely, a motion for a JNOV "may not be granted merely because a verdict is against the manifest weight of the evidence" and, instead, "is properly entered in those limited cases where all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict

based on that evidence could ever stand." (Internal quotation marks omitted.) *Id.* at 453.

¶ 85   Here, defendant's claim fails under either standard. First, she has again neglected to cite relevant legal authority to support her claim. In particular, she identifies no relevant contract principles that provide a basis for her cause of action. As already stated, an appellant's argument must "contain the contentions of the appellant and the reasons therefor, *with citation of the authorities* and the pages of the record relied on." (Emphasis added.) Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Such circumstances result in forfeiture of an issue on appeal. *Porter*, 396 Ill. App. 3d at 719.

¶ 86   Additionally, for the reasons explained above in connection with defendant's challenge to the jury's verdict in favor of James's estate, there was sufficient evidence presented at trial from which the jury could find that a promise by Jake to provide "show assistance" to defendant was not a material term of the parties' sale agreement. Accordingly, we find the jury's verdict as to this counterclaim was not against the manifest weight of the evidence. Nor did the evidence, when viewed in the light most favorable to Jake, overwhelmingly favor a verdict in defendant's favor.

¶ 87   3. *Interference With Contractual Relations*

¶ 88   Below, defendant also raised a counterclaim against Jake for "Interference with Contractual Relations." On appeal, she argues Jake admitted that he stopped her from showing the heifers she purchased at a cattle show and, as a result, she is entitled to either a new trial or a JNOV as to this claim.

¶ 89   Significantly, defendant's argument as to this issue in her appellant's brief consists of two sentences. She presents only a brief, conclusory statement of the relevant facts and includes no citation to any legal authority that would establish her entitlement to relief under her

counterclaim. Because defendant has effectively presented no reasoned analysis to support her requested relief, we find the issue forfeited and decline to further consider it. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *Porter*, 396 Ill. App. 3d at 719.

¶ 90 Additionally, following a jury trial in a civil case, "[a] party may not urge as error on review of the ruling on the party's post-trial motion any point, ground, or relief not specified in the motion." Ill. S. Ct. R. 366(b)(2)(iii) (eff. Feb. 1, 1994). We note the record shows defendant raised no challenge in her posttrial motion to the jury's verdict on her counterclaim against Jake for "Interference with Contractual Relations." As a result, this issue was also not properly preserved for review.

¶ 91                                4. *Assault*

¶ 92 Finally, on appeal, defendant argues she is entitled to a new trial on her counterclaim for assault. She asserts that an assault was proven at trial based on (1) her testimony that Jake raised his voice, threatened her, drew back his arm, got within 6 to 12 inches of her face, and scared her and (2) Jake's admission that he got within 12 inches of defendant and "that he got 'heated.' "

¶ 93 With respect to this claim, defendant correctly identifies the standard for the grant of a new trial. Specifically, she cites authority for the proposition that a new trial may be granted where the jury's verdict is against the manifest weight of the evidence. *Maple*, 151 Ill. 2d at 452-54. Importantly, though, she once again fails to cite legal authority that identifies the elements of her claim that would entitle her to relief. See Ill. S. Ct. Rule 341(h)(7) (eff. Oct. 1, 2020). Such deficiencies warrant a finding of forfeiture. See *Porter*, 396 Ill. App. 3d at 719.

¶ 94 However, even setting aside defendant's forfeiture, we would find no merit to her claim. "A claim of assault must include an allegation of a reasonable apprehension of an imminent

battery." *McNeil v. Carter*, 318 Ill. App. 3d 939, 944 (2001); see 720 ILCS 5/12-1(a) (West 2020) ("A person commits an assault when, without lawful authority, he or she knowingly engages in conduct which places another in reasonable apprehension of receiving a battery."). "The elements of a battery must include an intentional act on the part of the defendants and a resulting offensive contact with the plaintiff's person." *McNeil*, 318 Ill. App. 3d at 944.

¶ 95        Here, the evidence presented regarding defendant's claim of assault was conflicting. Although defendant and Pamela testified that during the incident at issue, Jake accused defendant of stealing, got "close" to defendant or "in [her] face," "clenched" his fists, and was "loud" and "aggressive," Jake and Lee described a different version of events. Jake acknowledged that the interaction was "heated," but he denied being loud, directly accusing defendant of stealing, or "ball[ing] up [his] fists." He also estimated that he remained a foot away from defendant while speaking with her. Lee testified similarly, stating he was 8 to 10 feet away from Jake and defendant and could not hear their conversation. He also denied seeing Jake raise his fists, become aggressive, or encroach on defendant's personal space. According to Lee, the two did not appear to be arguing and looked, instead, like they were having "a normal conversation." The photograph of the incident that was admitted into evidence showed Jake standing at a typical conversational distance from defendant.

¶ 96        In the context of a motion for a new trial, "the question of whom to believe and what weight to be given all of the evidence is a decision for the trier of fact, whose determinations should not be upset on review unless manifestly erroneous." *Peach v. McGovern*, 2019 IL 123156, ¶ 51. In this instance, there was sufficient evidence presented at trial to support the jury's verdict in Jake's favor as to defendant's assault counterclaim. Defendant and Jake presented conflicting versions of events, and it was within the province of the jury as the trier of fact to judge the

credibility of the witnesses and resolve those conflicts. In this instance, an opposite conclusion from the one reached by the jury was not clearly evident, and its decision was not against the manifest weight of the evidence.

¶ 97                                   III. CONCLUSION

¶ 98          For the reasons stated, we affirm the trial court's judgment.

¶ 99          Affirmed.